Homer L. WOXBERG, Sr., and Wayne Franklin Dykes, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18805.

United States Court of Appeals
Ninth Circuit.
March 12, 1964.

Rehearing Denied May 4, 1964.

Robert A. Neeb, Jr., Beverly Hills, Cal., for appellant Woxberg.

Cooper & Nelsen, and Grant B. Cooper, Los Angeles, Cal., for appellant Dykes.

Francis C. Whelan, U. S. Atty., Thomas R. Sheridan, Asst. U. S. Atty., Chief Criminal Section and Richard A. Murphy, Asst. U. S. Atty., Asst. Chief Criminal Section, Los Angeles, Cal., for appellee.

Before BARNES, MERRILL and KOELSCH, Circuit Judges.

BARNES, Circuit Judge:

Appellant Woxberg appeals his convictions on four counts of embezzlement and conversion of union funds, charged to be in violation of Section 501(c) of the Labor-Management Reporting and Disclosure Act of 1959 (Counts I, II, IX and X). Appellant Dykes appeals from his conviction on two counts (I and II).

Count I relates to the dissolution of a previously existing trust fund (sometimes known as a "severance fund") established by the executive board of a local union as a pension plan for its paid employees, amounting when it was dissolved to $35,178. Count II refers to a $220 payment made by the union for costs and expenses in the termination of said severance fund, including recordation fees and cost of an audit. Counts IX and X refer to $460.86 paid by the union for repairs to a Jeep automobile owned by Woxberg.

There were sixteen other counts on which one or more defendants were tried, but neither the other defendants, nor the other counts of which these defendants were acquitted, are here involved.

The union (Line Drivers Local 224 of the International Teamsters Union) came into existence in 1943 as a trusteeship, set up and controlled by the International Teamsters Union. In 1947 it operated as a local union, without trusteeship, under certain rules and regulations duly adopted. It elected a governing body of seven to an executive board. Four members of this board were the

elected officers. Defendant Woxberg was the secretary-treasurer of the union (the highest officer locally); Dykes was president. This was a board with apparent autocratic power, but it apparently was what the union members wanted or, at least, settled for.

On February 28, 1954, the executive board adopted a resolution, calling for the creation of a pension fund for the paid officers and employees of the union, which included appellants.

The rules and regulations of the local did not require that minutes and resolutions of the executive board be brought to the attention of the entire membership, but such a procedure was regularly followed.

A motion to approve the creation of the pension fund was made at a general meeting; the motion was tabled until the next meeting. We quote what followed from appellants' brief:

"The minutes of the general membership meeting of February 28, 1954 reflect that appellant Woxberg explained in detail the purpose of the proposed pension plan for the officers and employees of the Local Union. In particular it was pointed out that the moneys placed in the pension fund would be in lieu of increase in wages for the paid union employees for the next ten years, except for inflationary periods. At the next general membership meeting on March 28, 1954, a motion was made, seconded and carried to table the pension plan for the paid employees indefinitely.

"Immediately thereafter, the officers of the Union began negotiations with the employers for the purpose of establishing a pension plan for the regular members of the Union, which pension plan was ultimately obtained. On March 27, 1955, while these negotiations for a pension plan for the rank and file were still in progress, the executive board, at its regular meeting of that date, passed the following resolution:

"'After some discussion involving pensions and severance pay for the officers and office manager, a motion was made and seconded to concur in the request of the secretary authorizing him to have an attorney draft the trust agreement covering severance pay for the paid officers and office manager and deposit the insurance refunds in the severance trust. Motion carried.'

"At the general membership meeting of the same day, the minutes of the executive board meeting of that morning were read and approved.

"Prior to the executive board meeting of March 27th, appellant Woxberg as secretary-treasurer of the Union, had conferred with Richard Perkins, a lawyer, who was then a member of the firm of Bouchard and Perkins, as to whether or not such a fund could be established in accordance with the rules and regulations of Local No. 224. Mr. Perkins advised appellant Woxberg that such a fund could be legally established. Mr. Perkins then prepared the following 'Agreement and Declaration of Trust, Severance Fund Line Drivers Local 224'. This Trust Agreement, Exhibit 61, and E, consisted of 8 pages and provided in part as follows:

"'1. *Purpose of Trust:*

"'(a) The membership of Line Drivers Local No. 224, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, hereinafter referred to as "Local 224" an unincorporated association, has by resolution duly adopted voted to make contributions to a severance fund to provide a measure of security for certain paid officers and employees of Local 224 and provide benefits for them similar to some of the benefits available to employees of numerous private employ-

ers under pension, retirement, profit-sharing, and stock bonus plans;

" '(b) Local 224 has directed that insurance refunds payable to it from time to time shall be contributed for the aforesaid purpose, together with such other monies as may be designated for that purpose in the future; and

" '(c) It is desired to establish definite and orderly procedures through the device of a trusteeship to carry out the aforesaid purpose.'

"In addition thereto, there were the usual provisions covering such a trust including a designation of the requirements for becoming a beneficiary under the trust. On April 1, 1955, the Trust Agreement was signed and approved by all of the then beneficiaries, defendants Hester and Barnes, the office manager, Gladys Rang and appellants Woxberg and Dykes. The latter three signed in capacity as trustees.

"On April 3, 1955, at a special meeting of the executive board, the following motion was made and carried: 'The secretary read the Severance Fund Trust Agreement. The motion was made and seconded the Severance Fund Trust Agreement be approved effective April 1. Motion Carried.' While there was a special general membership meeting on April 3, 1955, the only matters that were discussed there concerned an anticipated strike.

"At the next regular general membership meeting, April 24, 1955, the minutes of the executive board and general membership meeting of March 27, 1955 were read and approved, and the minutes of the special executive board meeting of April 3, 1955 concerning the reference to the severance fund trust agreement was read and approved. No reference was made of any of these matters under the heading of new business.

"The resolution adopted by the executive board on March 27, 1955, not only authorized the drafting of the Trust Agreement, but also authorized the deposit of insurance refund checks in the trust fund account. [Exhibit 44.] Paragraph 1 (a) of the Trust Agreement [Exhibit E], prepared pursuant to this authority, provided that the funds necessary to establish the trust were to come from certain insurance refund checks belonging to Local 224. The insurance refunds, ultimately deposited in the severance fund account, were annual rebates or refunds on the insurance premium paid by the Local Union through the Western Conference of Teamsters for a group life insurance policy. This policy covered each member of the rank and file of Local 224, as well as the rank and file members of the other local unions making up the Western Conference of Teamsters. The amount of the refund checks varies from year to year since they were based upon the experience of the entire group policy for each preceding year. Because the original insurance premiums were paid from dues collected from the rank and file members, there was never any question that the insurance refund checks originally were the property of Local 224.

"Beginning in 1955, the refund checks were deposited in an account at the California Bank under the name of 'Severance Fund Line Drivers Union No. 224'. [Exhibit 1.] The refund checks deposited in the severance fund account were as follows:

"(1) Exhibit 29, Check dated March 1, 1955 in amount of $8,143.-43 payable to Line Drivers Local No. 224;

"(2) Exhibit 30, Check dated February 23, 1956 in the amount of $7,838.02 made payable to Line Drivers Local No. 224;

"(3) Exhibit 31, Check dated March 7, 1957, in the amount of $8,-149.40 payable to Line Drivers Local No. 224;

"(4) Exhibit 32, Check dated February 4, 1958, in the amount of $6,707.48 payable to Line Drivers Local No. 224.

"In each instance the refund check was endorsed for deposit in the 'Severance Fund, Line Drivers Union Local 224', and went directly into the severance fund account without passing through the regular Union account.

"On February 23, 1958, the executive board, having received a better offer from another insurance company which would effectuate a savings to the Local Union on insurance premiums for the same coverage, voted to change the company under which the rank and file group insurance policy was held. As a result there were no further refund checks paid to the Local Union. Thereafter the severance fund continued with the funds already on deposit and no further moneys of the Union were transferred to this account.

"The funds were invested almost entirely in second trust deeds and were supervised by one Larry McBride, a man thoroughly familiar with such investments. No question was raised at the trial that the severance fund was ever maintained in other than a proper manner, or that investments were improperly made. As a result, the severance fund prospered. At the time it was ultimately dissolved on November 2, 1959, and the cash and trust deeds distributed among the then beneficiaries, the fund was worth approximately $35,-000.00. It is on this amount that the government based the allegations of embezzlement under Count I. This, however, did not include the $5,958.00 distributed to the estate of Gladys Rang, upon her death [in 1957], which was done in accordance with the terms of the trust agreement. The same formula for determining each beneficiary's interest in the severance fund when dissolved in November, 1959, was also used in determining Gladys Rang's share in the fund at the time of her death."

The Landrum-Griffin Act of 1959 became effective on September 14, 1959. On September 27, 1959, the executive board, at the specific instance and request of appellant Woxberg who had conferred with union lawyers concerning the Landrum-Griffin Act and its ramifications, adopted the following resolution:

"Motion made and seconded that the Secretary-Treasurer be authorized in conjunction with the attorneys to discontinue payments to the Severance and Pension Plan Funds and car allowances to the paid employees and to distribute these monies to the employees as salary, thereby placing the responsibility of reporting to the government on the employee involved. Motion carried."

It was explained to the general membership by appellant Woxberg that because of the requirements of the Landrum-Griffin Act (calling for the union to report all its expenditures and other financial transactions periodically and in detail), it would be simpler to lump together as salary the car allowances and other fringe benefits, thus placing the responsibility upon the individual employees to report to the government as income these receipts on their income tax returns.

The executive board was advised by appellant Woxberg that this fund could be carried on as a private fund, thereby relieving the union of the necessity of making such a report to the government under the Landrum-Griffin Act.

The general membership meeting adopted, on September 27, 1959, an almost similar motion to that quoted above.

but referring to "pension plan" rather than "Severance and Pension Plan Funds." [1]

Thereafter Mr. Perkins, the attorney for the trust fund, prepared an agreement entitled "Agreement for Termination of Trust and Distribution of Assets." This agreement was approved by all of the beneficiaries, the local through its executive board, and the trustees of the severance fund. Following this, Larry McBride, who managed the investments under the severance fund, was engaged to and did make an audit of the condition of the fund and distributed to each of the beneficiaries, including appellants, their proportionate shares.

The remaining beneficiaries, all named defendants in this indictment, desired to continue the fund as a joint investment and therefore established a fund denominated the "Security Fund." Thereafter their proportionate share of the severance fund, together with some of their personal funds, were paid into the new security fund, thus making each of their shares equal. The security fund is still intact at this time.

The two primary questions there presented were:

(1) Whether the Landrum-Griffin Act was applicable. If the alleged conversion occurred before its passage (i. e., when the funds were *deposited* in the severance fund), then was the prosecution of defendants barred by Article I, § 9(3) of the United States Constitution as *ex post facto* legislation? This question of when the alleged unlawful conversion occurred, say appellants, was a question of law, to be determined by the trial court. The court left it to the jury, as a question of fact, instructing the jury as appears in the margin.[2]

---

1. The exact language of that resolution was:

"Motion was made and seconded that the Secretary-Treasurer be authorized in conjunction with the attorneys to discontinue payment to the pension plan and car allowance to paid employees and distribute these monies to the employees as salary, thereby placing the responsibility of the reporting to the government on the employee involved. Motion carried." (Ex. 44.) Compare with the motion adopted by the executive board.

"Now, I want to go back and discuss with you for just a moment or two the indictment. Count I concerns the severance fund and a large part of the testimony in this case concerns the severance fund and a large part of the testimony in this case concerns count I, the severance fund. I told you, I think I told you, I may not. You know that memory is tricky and I don't know whether I told you or not. I told the lawyers, but I think I told the lawyers in your presence, that one of the issues here to be determined by you is who owned the severance fund. Was the severance fund owned by the union or was it owned by the severance fund itself, by the trust? There is no dispute in this case that the money that went into the severance fund belonged to the union. It was union refunds. We have in evidence the checks and I have the checks before me, and the checks are made payable to Line Drivers Local 224. So when these checks were issued and delivered, they belonged to the union.

"They were deposited in the fund account. Did that deposit in the fund account mean that the money was transferred over to the fund, or did it belong to the union?

"Now, in determining this question, you can go back to Exhibit E, which is the agreement and declaration of trust, and you may determine how from this agreement that there was a transfer of these funds from the union to the trust. The agreement says:

'The membership by resolution duly adopted voted to make certain contributions to a severance fund to provide a measure of security to certain officers or paid employees.'

"And then Local 224 has directed that insurance refunds payable to it from time to time shall be contributed for the aforesaid purpose, together with such other moneys as may be designated for that purpose in the future.

"Now, here is a question of fact. Here is the agreement. It is for you to determine in your own mind whether or not these funds were transferred to the severance funds. If they were, then you will have to find the defendants not guilty on count I, because the charge is that they stole and converted the money from the union and, of course, if the union didn't have the money, then they can't be guilty

(2) Whether the payment of the union funds to the severance fund was *with the consent* of the union as wages, and therefore not unlawful as a matter of law.[3]

The third error charged (allegedly applicable to all counts) was that there was no proof of fraudulent intent on the part of the defendants; and the fourth—the refusal of the trial court to give Defendants' Proposed Instruction No. 38 (relating to "evidence susceptible of two interpretations").

## COUNT I

Did the conversion, if unlawful, and if violative of § 501(c), occur when the four refund checks were endorsed and deposited in the trust account, or when the trust fund was dissolved and the funds *withdrawn and turned into the new* security fund?

Count I alleges the conversion date was November 2, 1959, when the severance fund was dissolved. Appellants, denying any conversion, allege that if there was conversion, it occurred when the insurance refund checks were deposited in the severance fund. The trial judge recognized this issue was dispositive of Count I and instructed the jury this was an issue of fact for their determination.

Congress, in enacting this law (§ 501(c)), created a federal crime. The terms used in the legislation retain their common law meaning. (United States v. Turley, 1957, 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430, holding that the word "stolen" covers all felonious taking of property, whether obtained by "larceny" or "embezzlement," or "false pretenses.")

"Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from lar-

ceny in the fact that the original taking of the property was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking." Moore v. United States, 1895, 160 U.S. 268, 269–270, 16 S.Ct. 294, 295, 40 L.Ed. 422.

As counsel for appellants state:

"Applying these principles to the undisputed facts in the case at bar, one may at first blush reach what appears to be either of two reasonable conclusions (1) The original taking, the creation of the severance fund and the deposit of the insurance refund checks in the severance fund account was wrongful because at that instant the defendants fraudulently intended to deprive the union of these funds (embezzlement or larceny), or (2) the severance fund was in its inception legally and properly created by appellants and the insurance refund checks properly and legally transferred to the trustees under the severance fund by deposit in the severance fund account, but *without the passage of title from the union to the trustees.* Later, after passage of the Landrum-Griffin Act, appellants formed a fraudulent intent to embezzle these funds and then dissolved the severance fund and distributed the proportionate shares to the beneficiaries of the trust (embezzlement only).

"The first conclusion we concede is reasonable and the second we contend is unreasonable and not supported by the evidence or the law.

\* \* \* \* \* \*

"If the government contends that the criminal conduct here was larceny rather than embezzlement, then it must follow as a matter of law

---

of stealing and converting the money." (R. Tr. pp. 2778–2779.)

We note that similarly error is charged in the refusal to give Defendants' Proposed Instruction No. 34 (Tr. p. 172), which makes the interpretation a matter of law.

3. We note that similarly error is charged in the refusal to give Defendants' Proposed Instruction No. 47 (Tr. p. 181).

In view of our conclusion as to Count I, we need not pass specifically on this instruction.

that the unlawful conversion occurred when title to the insurance refund checks was transferred to the severance fund as each check was endorsed and deposited in the severance fund account. Thus, even assuming that the original taking was without right, and with fraudulent intent, appellants could not be prosecuted for violating Section 501(c) because this statute was not law at the time these conversions occurred, that is, between 1955 and 1958." (Emphasis by appellants.)

■■ It seems uncontradicted from the record, and particularly so from a reading of Exhibit E in evidence (the trust agreement) that when funds were deposited irrevocably in the severance fund the union had no voice in the management or use of these funds, except the duty to join in with the beneficiaries if it was desired to dissolve the trust before its normal expiration. This was a valid trust. Where a trust is valid, legal title is held by the trustee, and the *cestui que* holds a beneficial interest, or equitable estate. Such a fund is not the property of the union. Lewis v. Benedict Coal Corp., 1960, 361 U.S. 459, 465–466, 80 S.Ct. 489, 4 L.Ed.2d 442.

By the terms of the trust, both the defendants appealing qualified as beneficiaries *prior* to the enactment of the Landrum-Griffin Act.

We agree with appellants, then, that the court in this case was required to find as a matter of law that the title to the union funds, the insurance refund checks, passed to the trustees and the beneficiaries under the trust at the time that each check was endorsed and deposited in the severance fund account. Therefore the district court should have granted appellants' motions for acquittal on Count I. In denying the motions and leaving this question to the jury, the district court allowed the jury to reach a decision inconsistent with the facts and law in this case.

But the district court not only did not so instruct the jury as a matter of law

that title passed to the trustees of the trust, it refused to give Defendants' Proposed Instruction No. 34, which raised the factual issue as to whether the funds were or were not "union funds" after delivery to the trust. Exhibit 3 showed that the trustee of the fund had full control over the funds. The only evidence as to the intent of the trustee showed they acted upon legal advice of Mr. Perkins, who testified that, in his opinion, title to the insurance refund checks belonged in the trustee and not in the union. No counter-expert testimony was offered, and no evidence generally to show any belief in any member of the union that it had title or claim to the trust funds. Each of the defendants (including two nonindicted beneficiaries of the fund) testified that they believed the money in the trust fund was lawfully theirs.

In support of the prosecution's case, it is urged:

"The minutes of the general membership meeting of Local 224 on February 23, 1958 reveal that in discussing the cost of the group insurance *the membership was unaware* that Experience Rating Refunds were being received annually." (Emphasis added.)

No reference to transcript pages to support such a statement is made in appellee's brief. Such a characterization stems more from an advocate's zeal than from an accurate factual analysis of the minutes. The minutes of the general membership meeting read:

"The Executive Board minutes were read and approved. The portion of the Executive Board minutes pertaining to change of insurance was laid over to *New Business.* * * *

"*New Business.* In the discussion of changing insurance companies, a motion was made and seconded to change insurance companies and also to check into increasing the death benefit with the balance of the 34¢ without increasing the dues. Mo-

tion carried." (Exhibit 44, meeting of February 23, 1958, pp. 1, 2.)

How this demonstrates that the membership "was unaware that Experience Rating Refunds were being received annually," we cannot understand. Of course, the executive board had, by the rules and regulations adopted by the union, and approved by its membership, given the executive board near absolute power to conduct the union's affairs.[4] On April 3, 1955, the executive board had approved the severance trust agreement. Perkins prepared the dissolution of the trust agreement, and his bill was paid by the union.

A month after the deposit of insurance refunds in the severance trust fund stopped, and for nineteen months thereafter, defendants Dykes, Hester and Barnes each received monthly a $500 Government Bond purchased by Local 224. No charge is made in this case that such payments were illegal. They do indicate some recognition by those governing the local that some officers benefiting from the severance fund were to be rewarded for their services in another way, if insurance refund payments to the severance fund were to be terminated.

There is other evidence which raises doubt as to whether the general membership were not as familiar with the severance fund as they were with any other aspect of the local union's finances and operation. Concededly this "information" may not have been complete, but under the organizational framework chosen by the membership this was the way they apparently wanted their union affairs run.

Appellee refers more than once in its brief to the alleged fact that "the mem-

bers were unaware" of the annual insurance refunds (p. 21); that "during the entire period in which the severance fund was in existence no mention was made of it to the rank and file members of Local 224" (p. 25); that "not only the creation of the Severance Fund was concealed, but even its existence and later distribution was concealed * * * from the rank and file members of the Executive Board and the general membership as well." (P. 36.)

If we assume this to be true, it may establish sufficient evidence from which a jury might conclude that there was an unlawful taking of funds from the union to deposit in the trust (a matter we do not herein decide), but it also emphasizes the fact the taking was at the time when the insurance refunds were deposited, not when the severance fund was distributed. If this was embezzlement, then it was the taking of money which had lawfully come into the hands of the holder, and the original insurance refunds must have lawfully come into the defendants' hands. If the fund was unlawfully created, then it was not embezzlement but theft or larceny, and the taking occurred either when the original severance fund was set up, and the first deposit made, or perhaps, as each subsequent deposit was made in the fund.

■■ Either the creation of the severance fund and the subsequent deposits therein were done with the approval of the general membership (or, at least, with the approval of the executive board authorized to act for the general membership), or without any such approval. If approval was had of additional wages, they were lawfully paid. If approval was not had by either the general mem-

---

4. Local 224 Rules, adopted November 23, 1947, provided in part as follows:

"* * * * *

(2) The administration, supervision and direction of the affairs of Local No. 224 shall be vested in the Secretary-Treasurer and the President, subject to the approval of the Executive Board.

(3) All employees of Local No. 224 shall be employed and directed by the Secretary-Treasurer and President.

(4) Salary and expenses of all employees shall be set and approved by the Secretary-Treasurer and the President, subject to the approval of the Executive Board. No action shall be taken by the Executive Board or the membership meeting of Local No. 224 that in any way effects policy or expenditures of money in the absence of the Secretary-Treasurer and President. * * *" (Ex. 43.)

bership or the executive board, as appellee urges, then the taking was unlawful. This taking was done between 1954 and 1957, and prior to the passage of the Landrum-Griffin Act, effective September 14, 1959. The Act could not make a federal crime out of acts of a defendant which prior to that time had not been federal crimes, but acts punishable under state law. To make the acts retroactively criminal would have constituted an *ex post facto* application of § 501(c), and would be violative of Article I, § 9 (3) of the United States Constitution.

The judgment of conviction of each defendant as to Count I is reversed, and the Count dismissed.

## COUNT II

■ Appellants urge there was no fraudulent intent as to the convicted defendants with respect to Count II—the payment of $220 to Larry McBride for services rendered by him to the severance fund in dissolving it, and not to the union. The expenditure by the union, allegedly arranged for by appellants, of the $220 saved for the benefit of the severance fund (Gov.'s Ex. 2) occurring on December 2, 1959, if it was a violation of the Landrum-Griffin Act, occurred *after* its passage on September 14, 1959.

Whether the union approved of this payment, or whether it was obtained with fraudulent intent by marking the check "arbitration audit" and entering the charge on the union expense sheets in this inaccurate manner presented a question of fact that the jury decided adversely to appellants.

Appellants argue that the union had "a continuing duty to. see to it that the funds contained therein were distributed to the employees as a gross amount." (Br. p. 65.) This is valid argument to a jury, but not to this court. Reliance is placed on United States For Benefit and on Behalf of Sherman v. Carter, 1957, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed.2d 776, but the facts of that case do not resemble those here present. To make

that case applicable would require us to find that the original creation of the severance fund was lawful, a question which we do not reach because of our determination that the lack of retroactive effect of § 501(c) is here controlling as to Count I, and a question decided adversely to appellants by the jury.

Nor is the error preserved to appellants by the trial court's failure to give Defendants' Proposed Instruction No. 38.[5] (Clk's Tr. p. 175.) This claim is based upon appellants' contention that "[E]ven assuming that there is some shred of evidence on which a fraudulent intent could be inferred, the jury could not ignore, nor can this court ignore, the overwhelming evidence that in this case the transfer of the union funds was done under a *bona fide* claim of right, and was completely open and above-board." (Brief, p. 57, emphasis by appellants.) While such a claim might well be urged as to Count I, the same evidence does not exist as to Count II. Looking at the evidence as we must, in a manner most favorable to the prosecution, Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, we cannot hold there was no jury question, as a matter of law, on the record before us.

Appellants' attack upon the refused jury instructions (and particularly No. 38) is based upon an old line of cases that held that in "a criminal case based upon circumstantial evidence, in order for the motions [for acquittal] to be denied, guilt must be the only reasonable hypothesis from such evidence"—or that it is necessary (to convict) "that the directly proven circumstances be such as to exclude every reasonable hypothesis but that of guilt," citing cases (Brief, pp. 58, 59).

■ As we recently pointed out in Byrnes v. United States, 9 Cir., 1964, 327 F.2d 825:

"5a. Appellant urges us to accept his argument that in order to convict, inferences that may be drawn

5. Defendants' Proposed Instruction No. 38 is CALJIC form No. 26.

from circumstantial evidence must not only be consistent with a defendant's guilt, but inconsistent with every reasonable hypothesis of innocence (Opening Brief, pages 23–25), or, as it is sometimes phrased 'irreconcilable with any other rational conclusion.' This is the old rule which the Supreme Court disapproved in Holland v. United States, 1954, 348 U.S. 121, 139–140, 75 S. Ct. 127, 99 L.Ed. 150. Cf. Strangway v. United States, 9 Cir. 1963, 312 F.2d 283, 285; cert. denied 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199; Bolen v. United States, 9 Cir. 1962, 303 F.2d 870, 874; Cape v. United States, 9 Cir. 1960, 283 F.2d 430, 433; Remmer v. United States, 9 Cir. 1953, 205 F.2d 277, 287, 288; reversed on other grounds 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654; Stoppelli v. United States, 9 Cir. 1950, 183 F.2d 391, cert. denied 340 U.S. 864, 71 S.Ct. 88, 95 L.Ed. 631, rehearing denied 340 U.S. 898, 71 S.Ct. 237, 95 L.Ed. 651. The current test is whether *'reasonable minds could find* that the evidence excludes every hypothesis but that of guilt.' "

The conviction as to Count II is *affirmed.*

## COUNTS IX and X

Inasmuch as the convictions of Woxberg alone on Counts IX and X resulted in concurrent sentences with Count II, both as to the time to be served and the fine to be paid, it becomes unnecessary for us to pass upon the validity of the Counts IX and X conviction, Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692; Claasen v. United States, 1891, 142 U.S. 140, 146–147, 12 S.Ct. 169, 35 L.Ed. 966; Wilson v. United States, 1963, 9 Cir., 316 F.2d 212, 214.

■ However, we desire to state the following:

We find no evidence of an essential intent in any "taking" on the part of Woxberg as to these two counts. There was a full explanation of the Jeep transaction on the union's books. When called upon to repay the union, Woxberg did so, at once and in full. It is argued that this payment was only after the government's investigation into the union's affairs had begun. This is true, but it is also true no demand was made for the repayment until after the government started its investigation, and there was no evidence Woxberg, when he paid, knew of the government investigation. Further, the work had been ordered when Woxberg was out of the country. It was Dykes, not Woxberg, who ordered the work. Dykes arranged for the advance from the union. Co-defendants Dykes and Hester signed the union's check (Gov.'s Ex. 10). They were acquitted on Counts IX and X.

Appellee makes much of the letter dated April 21, 1961, referring to the $105.-86 payment [6] for Woxberg. But Woxberg did not sign that letter.

Again, such procedure as was here followed (advances by the union for personal obligations of its officers—later repaid) took place with frequency—perhaps with too much. But none of this shows the intent to appropriate. We reverse the judgment of conviction of Woxberg as to Counts IX and X.

Reversed as to Count I as to both defendants. Affirmed as to Count II as to both defendants. Reversed as to Counts IX and X as to defendant Woxberg.

6. Part of the total of $460.86 paid for repairs to the Jeep.