**UNITED STATES of America,**

**v.**

**Vincent CARVELLI et al., Defendants.**

**No. 69–CR–384.**

United States District Court,
E. D. New York.

April 5, 1972.

Robert A. Morse, U. S. Atty., E. D. N. Y., Denis E. Dillon, Brooklyn, N. Y., Atty. in Charge, Organized Crime Section, Richard L. Shanley, Sp. Atty., U. S. Dept. of Justice, of counsel, for United States.

Jonathan L. Rosner, New York City, for defendant, Jesse Smith.

Bracken & Sutter by John Joseph Sutter, Mineola, N. Y., of counsel, for defendant, Rocco Lauria.

## FINDINGS OF FACT
### and
## CONCLUSIONS

TRAVIA, District Judge.

The defendants, Vincent Carvelli, Jesse Smith, and Rocco Lauria, are charged in a nine count indictment with eight substantive counts [1] of violating Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891 et seq., by using extortionate means in collecting an extension of credit as proscribed by 18 U.S.C. § 894,[2] and with one count of wilfully and knowingly conspiring to commit offenses against the United States in violation of 18 U.S.C. § 894 by the use of an extortionate means to collect an extension of credit, from on or about November 4, 1967, up to and including the date of the indictment.[3]

1. The eight counts involve the explicit threat of the use of violence and other criminal means to cause harm to the property and the four year old son of Howard Clyde, the person to whom the credit was extended on the following eight dates: (1) May 30, 1968, (2) June 6, 1968, (3) June 13, 1968, (4) June 20, 1968, (5) June 27, 1968, (6) July 3, 1968, (7) July 10, 1968, and (8) July 17, 1968.

2. 18 U.S.C. § 894 reads in pertinent part:
"(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
(1) to collect or attempt to collect any extension of credit, or
(2) to punish any person for the non-repayment hereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both."

3. It is charged that, as part of the conspiracy, the defendants

" . . . having made extensions of credit . . . and having collected payments . . . and having notified Howard W. Clyde, the debtor, that he was in arrears on his payments and having demanded these payments to be paid and having threatened the said Howard Clyde that they would burn down his place of business and his home if he did not pay the extensions of credit and having visited the wife of the said Howard Clyde at his home and having threatened to physically injure her four year old son if the said Howard Clyde did not continue making payments on the said extensions of credit, would demand and would receive payments from the said Howard Clyde and his wife."

It is also charged that the following overt acts were committed in furtherance of the conspiracy: the collection of $75.-00 from Mrs. Howard W. Clyde by Vincent Carvelli at the Cadillac Lounge in

Defendant Carvelli has pleaded guilty to Count Nine of the indictment in full satisfaction of all counts pending against him. He is awaiting sentence.

All the remaining parties and their respective attorneys, by stipulation dated January 20, 1972, and marked Court Exhibit 1 in evidence, agreed that the case be tried by the Court without a jury. The defendants were advised of their right to a trial by jury, and, by the said stipulation and after interrogation in open court, they waived their right to a trial by jury in accordance with the provisions of Rule 23, Fed.R.Crim.P.

It was further agreed by the parties in said stipulation that the Court, sitting without a jury, may consider the statements of certain Government witnesses and certain exhibits, marked Government Exhibits 1 through 12 in evidence, as all the evidence in the case, as if the same had been presented in open court at a trial of the case, and that judgment may be entered thereon. The defendants, pursuant to their pretrial stipulations, have withdrawn their motions to suppress Government Exhibits 1 through 12. The Government has stipulated that it would not make use of the evidentiary provisions of 18 U.S.C. § 894 (b) and (c). Defendant Smith has moved to strike Government Exhibit 10 on the basis of relevancy. This Court, after examining the exhibit in question, has determined that it is not relevant to the instant case, and it is therefore ordered stricken.[4] The defendants have moved for the entry of a judgment of acquittal.

The following constitutes this Court's findings of fact.

In commencing operations at an auto repair shop which he purchased in October 1967, Howard Clyde encountered serious financial difficulties. Unable to secure an extension of credit through legitimate channels, Clyde entered into a series of transactions with Vincent Carvelli wherein he borrowed a total of $1250.[5] Carvelli was repaid $2250 in a series of weekly payments; the loan was cancelled in February 1968.[6]

In January 1968, his financial condition remaining desperate, Clyde discussed his plight with one, Joseph Lombardi. Lombardi indicated that a loan of $2000 might be possible but confirmation would be required from Jesse Smith. In February 1968, Smith was introduced to Clyde and he agreed to lend him $2000.

Prior to Clyde's receipt of the money, Lombardi informed him of Carvelli's displeasure with his loss of business to Smith. It was thus agreed shortly thereafter that the $2000 loan would be made by Smith and Lauria, each of them furnishing $1000. On February 16, 1968, Carvelli delivered the first half of the $2000 to Clyde, advising him that he would be required to repay the sum of $3600 on the $2000 loan. Two days later, Carvelli delivered the remainder of the loan informing him that "the terms of this $2000 loan would have to be $50 principal and $100 'vig' a week until the loan was paid off."[7]

Smithtown, New York, on each of the following dates: June 6, 1968, June 13, 1968, and June 20, 1968, the dates alleged in Counts Two, Three and Four respectively.

4. This Court has ordered that all materials, documents, papers and money seized from defendant Smith at the time of his arrest be suppressed for use in evidence against him, except insofar as those documents have been received in evidence as Government Exhibits 1 through 12.

5. Carvelli was in fact an intermediary between defendant Rocco Lauria and Clyde. The $1250 which was loaned to Clyde was

furnished by Lauria; each of Clyde's repayments was turned over to Lauria. Carvelli was paid a fee by Lauria for the perrformance of his services.

6. *See* Government Exhibits 1 and 2. These are calendar pages for the months of November and December 1967 from Clyde's office calendar on which he noted his payments to Carvelli.

7. Clyde understood "vig" to be a shorthand term for "vigorish", a word meaning the excessive interest charged by persons engaged in loansharking activities. Having previously borrowed money at exorbitant

During the ensuing several weeks, Lombardi [8] appeared at Clyde's shop on a weekly basis to pick up checks as payments came due.[9]

In March 1968, Clyde was informed by Lombardi that all subsequent payments were to be made in cash; Clyde also received a telephone call from a party identifying himself as Jesse Smith insisting that future payments be made in cash. Thereafter, all payments were made in cash to the defendant Carvelli or to the conspirator Lombardi. Eventually, Carvelli took over all collections for the defendants Smith and Lauria.

During the months of February and March 1968, Rocco Lauria accompanied Carvelli to Clyde's shop to receive a weekly payment; Jesse Smith also accompanied Carvelli on approximately three occasions.

On April 10, 1968, Carvelli, Smith and Lauria visited Clyde's shop to clarify a misunderstanding as to whom outstanding payments should be made. At that time, Carvelli introduced Lauria to Clyde as "my boss." Lauria and Smith informed Clyde that all subsequent payments were to be made to Carvelli and that Lombardi had been withdrawn from the transaction. When Clyde interjected that he had paid Carvelli in full, Lauria stated: "Are you trying to call me a liar? I'll burn this station down and your house, too. You still owe me $150 and I want it." Smith also made a similar comment, and when Clyde argued back, Lauria again interjected, "Don't talk to me like a dog." Carvelli then interceded and said to Clyde, "I don't want to see you get hurt, these guys are mean." Mrs. Clyde arrived on the scene shortly thereafter, and Lauria made certain remarks that frightened her considerably.

After the incident, Clyde expressed his fears as to what might happen to himself, his family, and his property to two of his employees and his wife. Clyde and his wife resolved to pay the defendants at any cost.

Several weeks after the incident at the shop, Clyde was forced to close his business through economic necessity; he secured new employment which he attempted to conceal from the defendants.

On or about May 8, 1968, Lauria and Smith visited Clyde's home. Smith told Mrs. Clyde that he and Lauria intended to collect the money owed to them. Upon seeing Clyde's four year old son, whose arm was bandaged, Smith remarked, "It would be bad if something of this sort happened to his face." Mrs. Clyde was extremely frightened by the threat and stated that she and her husband were making payments as well as they could. Smith stated that he had ways to determine where people were, and he indicated that he knew where Mr. Clyde worked and the schools the children attended. When informed of the incident, Clyde again resolved with his wife to pay the defendants at all costs; their determination was a consequence of their fears induced by the defendants' explicit threats.

During May 1968, Carvelli arrived at Clyde's home to receive weekly payments. In late May, as a result of Mrs. Clyde's reluctance to having Carvelli visit her home, it was agreed that Mrs. Clyde would make weekly payments of $150 to Carvelli at the Cadillac Lounge in Smithtown, Long Island, New York. Pursuant to that agreement, on May 30, 1968, June 6, 1968, June 13, 1968, June 20, 1968, June 27, 1968, July July 3, 1968, July 10, 1968, and July 17, 1968,[10] Mrs. Clyde made payments to

---

interest rates, he was familiar with the language used in the "loansharking" business.

8. Lombardi was performing the pickup service for Smith; Carvelli continued to work for Lauria.

9. *See* Government Exhibits 3, 4, 5 and 6.

10. *See* Government Exhibits 7, 8 and 9. These are three checks identified by Mrs. Clyde as checks which were cashed for money to make total or partial payments on particular days. *See also* Government Exhibits 11 and 12.

Carvelli which Carvelli in turn remitted to the two other defendants as he had the previous collections he had made.[11] On each of these dates, the Clydes were fearful that the defendants would fulfill the threats to destroy their property or harm a member of their family. As a consequence, Mrs. Clyde was therefore invariably accompanied to the Cadillac Lounge by a family friend.[12]

In late July 1968, the Clydes left their home in Centereach, Long Island, New York, to avoid further payments to the defendants and to escape possible harassment from them. After their flight, Smith complained to Carvelli that he had not received all the payments due to him; he stated, "I got left holding the bag."

## I.

Defendant Lauria seeks dismissal of the indictment against him on the ground that, as a prospective defendant, he was forced to invoke his Fifth Amendment right against testimonial compulsion before the grand jury that was to indict him and which had him as its sole target of investigation. He notes that at the time of his appearance before the grand jury, his co-defendants, Vincent Carvelli and Jesse Smith, had previously been indicted (69–CR–92) and that after his refusal to respond to the bulk of the questions propounded to him, a superceding indictment (69–CR–384) adding him as a defendant was returned by the grand jury.

Conceding that the general rule in the Second Circuit is that the Fifth Amendment privilege does not preclude the summoning of a prospective defendant before a grand jury, Lauria contends that in such a situation the courts must balance the "defendant's" Fifth Amendment rights against

" . . . the legitimate authority of a duly constituted Grand Jury to fully investigate murky areas that require intense scrutiny because of the numerous places, times and personages involved and/or subterfuge and devious practices by the alleged wrongdoers tending toward a highly complicated factual and legal situation."

He maintains that this "garden-variety loansharking situation" was not so complex as to make it proper to call the prosective defendant before the grand jury and thereby deprive him of his Fifth Amendment rights.

Lauria's claim is without merit. Although some authority exists to support his contention,[13] the Court of Appeals, Second Circuit, has long followed the unqualified rule that the self-incrimination clause of the Fifth Amendment does not prohibit the summoning before a grand jury of one who has become the target of inquiry and who is a potential defendant. United States v. Sweig, 441 F.2d 114, 121 (2d Cir. 1971), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971); United States v. Corallo, 413 F.2d 1306, 1328 (2d Cir. 1969), cert. denied, 396 U. S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969); United States v. Capaldo, 402 F.2d 821, 823–824 (2d Cir. 1968); United States v. Winter, 348 F.2d 204 (2d Cir. 1965), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965); Unit-

11. The collection agent, Carvelli, turned over the payments to either Smith or Lauria, whoever was the first to contact him. This arrangement led to problems between Carvelli's two principals, Smith and Lauria, since Smith complained that when Lauria received the payments Smith did not receive his share. Both principals informed Carvelli on separate occasions that "We'll have to get together to straighten this out."

12. Smith's Day-Timers (Gov. Exhibits 11 and 12) contain many references to

Lauria, Carvelli and Clyde for the months of November 1967 through July 1968.

13. *See* Jones v. United States, 119 U.S. App.D.C. 284, 342 F.2d 863, 867–870 (1964) (minority position); United States v. Scully, 225 F.2d 113, 116 (2d Cir. 1955) (Medina, J.) (dictum); Sheridan v. Garrison, 273 F.Supp. 673 (E.D. La.1967), reversed on other grounds, 415 F.2d 699 (5th Cir. 1969), cert. denied, 396 U.S. 1040, 90 S.Ct. 685, 24 L.Ed. 2d 685 (1970).

ed States v. Potash, 332 F.Supp. 730 (S. D.N.Y.1971).[14]

■ If Lauria's statement of applicable law were correct, his claim would nevertheless fail. This case is more complex than Lauria would have the Court believe. It involves an extension of credit over a period of many months, several instances of extortion, and, most significantly, the interrelationships among the three co-defendants and certain other parties. The investigation of this case would not have been adequate or in any sense complete without "at least an effort to glean some small harvest of information from those suspected of being involved." *See United States v. Corallo, supra* at 1328. No harassment was involved and Lauria was fully advised of his constitutional rights when he appeared to testify. The defendant Lauria therefore was not unduly prejudiced by his appearance before the grand jury and his Fifth Amendment rights were not violated.

## II.

The defendants argue that convictions under the first eight counts of the indictment would violate Article I, Section 9, Clause 3 of the Constitution in its ban against *ex post facto* laws and also the due process clause of the Fifth Amendment to the Constitution. They maintain that the criminal acts for which they were indicted and which are proscribed by Title 18 U.S.C. § 894, occurred prior to the effective date of the statute and that they are therefore immune from prosecution thereunder.[15]

The defendants are charged with the use of *extortionate means in collecting an extension of credit* on eight separate occasions; more specifically, it is alleged that they "explicitly threatened the use of violence and other criminal means to cause harm to the person of Howard Clyde, Jr., . . . and to the property of Howard Clyde, Sr." It is readily conceded that the evidence adduced conclusively establishes that the defendants did make extensions of credit within the meaning of Title 18 U.S.C. § 891(1) and that they did use extortionate means as defined in Title 18 U.S.C. § 891(7) in its collection.[16] However, the defendants note that the eight counts relate only to collections of payments. They contend that these acts of collection are not within the statutory definition of "extortionate means" and that the only acts of the defendant which fall within the statutory definition are the April 10, 1968 incident at Clyde's service station, the May 8, 1968 visit to Clyde's residence, and other acts prior to May 1968. Since these acts occurred prior to the effective date of the Consumer Credit Protection Act, May 29, 1968, it is argued that the defendants cannot be prosecuted for their conduct.

14. *See also* 8 Moore's Federal Practice § 6.06 [1] at 6–36 (1968) wherein it is noted that although the Court of Appeals, Second Circuit, once acknowledged the existence of an ethical problem for the prosecution in summoning a prospective defendant before the Grand Jury (*Scully, supra* at note 13), arguments favoring immunity are now flatly dismissed.

15. Several recent cases have involved constitutional challenges to Title II of the Consumer Credit Protection Act, 18 U.S.C. § 891 et seq., on the ground that Congress exceeded its power under the Commerce Clause in enacting the legislation since it has no power to control loan-sharking activities of a local character. The Supreme Court has put this argument to rest by its decision in Perez v.

United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) in which it upheld the constitutional validity of the legislation under the Commerce Clause.

16. 18 U.S.C. § 891(1) reads:
"To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred."
18 U.S.C. § 891(7) reads:
"An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."

The Government maintains that each collection of the credit extended was predicated upon the continuing fear engendered in the Clydes by the April 10 and May 8, 1968, explicit threats; that is, the threats were renewed and used by the defendants each time a loan repayment was collected. They therefore argue that each of the eight collections amounted to the use of an extortionate means to collect an extension of credit.[17]

■ The argument of the Government is without merit. An extortionate means is one

". . . which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." (18 U.S. C. § 891(7)).

The indictment specifically charges among other things that the defendants "explicitly threatened" the use of violence and other criminal means in collecting an extension of credit. The Government is, therefore, bound to prove that the defendants *explicitly* threatened the use of violence and other criminal means on each of the eight occasions contained in the indictment. In the instant case, there is no evidence of any communication from the defendants Smith or Lauria to either of the Clydes subsequent to the explicit threats made by them before the effective date of the statute, and the only acts by any of the defendants subsequent to the effective date of the statute were the receipts by the defendant Carvelli from Mrs. Clyde of the one hundred and fifty dollar payments on May 30, June 6, June 13, June 20, June 27, July 3, July 10 and July 17, 1968, without any threats. Even assuming that the defendant Carvelli turned over those receipts to the defendants Smith and Lauria as his testimony and Government exhibits indicate, his testimony as a Government witness that he never threatened the Clydes and the absence of any claim of such by the Clydes against him, coupled with his testimony that he was unaware of the May 8, 1968 threat, leaves the record barren of any evidence that subsequent to May 29, 1968, the effective date of the statute, explicit threats had been made. For this Court to construe the term "extortionate means" as used in the indictment to include the collections made without explicit threats after the statute's effective date would be for it to move beyond the bounds of reason.[18]

Certain cases involving § 894 are relevant in that they are distinguishable from the instant one. *See* United States v. DeStafano, 429 F.2d 344 (2d Cir. 1970), cert. denied, 402 U.S. 972, 91 S. Ct. 1656, 29 L.Ed.2d 136 (1971); United States v. Curcio, 310 F.Supp. 351 (D.

---

17. The Government relies on United States v. Tolub, 309 F.2d 286 (2d Cir. 1962), a case involving the Hobbs Act, 18 U.S.C. § 1951 et seq., which prohibits, *inter alia*, interference with interstate commerce by extortion. The case is distinguishable from the instant one. In *Tolub*, it was argued that threatening activities of the defendants could not be the subject of prosecution since they occurred beyond the statutory period of limitation. The argument proved unconvincing since the acts proscribed by the statute and for which the defendants were indicted were acts of "extortion", defined in terms of obtaining property from another. 18 U.S.C. § 1951(b) (2). Since the conduct of the defendants in wrongfully obtaining property from another fell within the statutory period and also within the statutory definition, their convictions were valid.

18. "Extortionate means" also includes the implicit threat of the use of violence or other criminal means. 18 U.S.C. § 891(7). Several cases have been decided under that aspect of the statute. United States v. Antonelli, 439 F.2d 1068 (1st Cir. 1971); United States v. Calegro de Lutro, 309 F.Supp. 462 (S.D.N.Y.1970), aff'd sub nom. United States v. DeLutro, 435 F.2d 255 (2d Cir. 1970); United States v. Curcio, 310 F.Supp. 351 (D.Conn.1970) (Timbers, J.); United States v. Joines, 327 F.Supp. 253 (D.Del.1971). Perhaps an argument could be made herein that there was a statutory "extortionate means" involving implicit threats each time a collection was made. Since the Government must prove what the indictment charges, however, "explicit threats" must be proven.

Conn.1970) (Timbers, J.); United States v. Biancofiori, 422 F.2d 584 (7th Cir. 1970). Each of these cases involved loans made prior to the effective date of the Consumer Credit Protection Act. Arguments involving the "ex post facto" effect of the legislation as applied to the defendants failed, since in each case the evidence clearly established that the threats constituting the extortionate means, as well as the collections pursuant to the threats, were subsequent to the effective date of the legislation. The Court of Appeals, Second Circuit, in United States v. DeStafano, *supra* at 347, stated:

> "[T]he making of the loan was not . . . an element of the crime. Appellant was charged with using extortionate means to collect a loan already made. That portion of appellant's conduct clearly occurred after the effective date of the statute."

It was also stated in United States v. Biancofiori, *supra* at 585, that:

> "On this appeal, defendant stresses that the loans were made by defendant before 18 U.S.C. § 894 became effective. This is entirely irrelevant. *It is the use of extortion in the course of loan collections which is the conduct made unlawful by the statute . . . .*" (Emphasis supplied).

Unlike the above cases, the "use of extortion"—the conduct constituting extortionate means within the statutory definition—occurred prior to the effective date of § 894. Thus, although the statute in question is valid, convictions of these defendants under the first eight counts of the indictment would violate the Constitution's ban against *ex post*

*facto* laws and the due process guarantees of the Fifth Amendment. *See* Calder v. Bull, 3 Dall. 386, 1 L.Ed. 648 (1798); Lindsey v. Washington, 301 U. S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).[19]

Therefore, the first eight counts of the indictment must be dismissed. However, they are dismissed without prejudice to the Government's use of the necessary facts contained therein, and those facts adduced in their support, in the attempt to prove Count Nine of the indictment.

### III.

The defendants also seek to persuade this Court that Count Nine, the conspiracy count, is invalidated by the Constitution's ban against *ex post facto* laws and by the due process requirements of the Fifth Amendment. They argue that however morally repugnant their conduct might have been, they did not engage in a conspiracy legally prosecutable in a federal court. They contend that their conduct prior to the effective date of § 894 is immune from prosecution, and since the evidence establishes no actions of the defendants after the effective date, other than the receipt of payments from the Clydes, they cannot be said to have conspired to use an extortionate means to collect an extension of credit in violation of § 894.

The evidence conclusively establishes that the defendants did conspire to use an extortionate means to collect an extension of credit prior to the effective date of § 894, May 29, 1968. Moreover,

19. The defendants could probably have been successfully prosecuted by the New York State authorities for their extortionate conduct. N.Y. Penal Law §§ 155.05(2)(e), 190.40 (McKinney 1967). That does not diminish the *ex post facto* effect of the eight counts under a federal indictment. *See* Woxberg v. United States, 329 F.2d 284, 293 (9th Cir.), cert. denied, 379 U.S. 823, 85 S.Ct. 45, 13 L. Ed.2d 33 (1964) wherein it was stated:

"The [Landrum-Griffin] Act could not make a federal crime of acts of a defendant which prior to that time had not been federal crimes, but acts punishable under state law. To make acts retroactively criminal would have constituted an *ex post facto* application of the [Act] and would be violative of Article I, § 9 (3), of the United States Constitution."

the defendants readily concede that their conduct was prosecutable on both substantive and conspiracy counts under the relevant New York State statutes, N.Y. Penal Law §§ 155.05(2)(e), 190.40 (McKinney 1967). The issue before this Court, however, is whether the defendants conspired in violation of § 894 to use an extortionate means to collect an extension of credit from Howard Clyde after the effective date of § 894.

Several cases have been decided on issues similar to the instant one. In United States v. Markman, 193 F.2d 574 (2d Cir. 1952), cert. denied, 343 U.S. 979, 72 S.Ct. 1079, 96 L.Ed. 1371 (1952), a defendant appealed his conviction of conspiracy to traffic in narcotic drugs in violation of 18 U.S.C. § 371 on the ground that no evidence had been adduced establishing participation in the conspiracy after the effective date of the relevant legislation. In disposing of the defendant's argument, the Court of Appeals, Second Circuit, stated:

"There is, however, competent proof that the conspiracy continued after [the effective] date. Markman, if he is to claim disassociation from it, must adduce affirmative proof to this effect. United States v. Compagna, 2 Cir., 146 F.2d 524, certiorari denied Compagna v. United States, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422; United States v. Cohen, 2 Cir., 145 F.2d 82, certiorari denied Cohen v. United States, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637. He has failed to do this." (193 F.2d at 576).[20]

United States v. Wechsler, 392 F.2d 344 (4th Cir. 1968), cert. denied, 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968), involved the conviction of certain real estate developers for conspiring to violate 18 U.S.C. § 1952 prohibiting the use of interstate facilities for an unlawful purpose. The unlawful purpose consisted of the bribery of two local officials to vote for the rezoning of land which the defendants were interested in. In upholding the convictions against the argument that the conspiratorial acts had occurred prior to the effective date of the relevant legislation and that the defendants were thereby immune from prosecution because of the *ex post facto* clause, the Court stated:

"The most serious argument advanced by the appellants, and the one on which most of their other arguments depend, is that their crime was complete before the statute was enacted. We disagree. Their theory is that under Virginia law the crime of bribery is complete upon the giving, offering, or promising of a bribe even though the official act to be done in consideration therefor is to occur in futuro. The fallacy in their argument lies in a too heavy reliance on state law. The state crime serves 'only as a background identification of the unlawful activities.' United States v. Wingo (6th Cir. 1967); United States v. Kubacki, 237 F.Supp. 638, 643 (E.D.Pa. 1965). We have no doubt that when the money passed, if not before, the state law of bribery had been violated and that appellants could then have been indicted in the state courts; in that sense their crime was complete. But, their crime was not yet completed. Their activities continued beyond that point and indeed, beyond the date on which the statute was enacted. The manifest purpose of the statute is to deny the use of facilities in interstate commerce to those who would effect a wrong on the people by corrupting public officials. The wrong was not done to the people until the re-zoning was accomplished and the accomplishment of that wrong, after the use of a facility in interstate commerce, is

20. Defendants attempt to demean the relevance of *Markman* and also of United States v. Borelli, 336 F.2d 376 (2nd Cir. 1964), *infra*, on the ground that the conduct of the defendants was proscribed in its substantive aspects prior to the effective date of the conspiracy statute under which the defendants were charged and the new legislation merely added conspiracy offenses to the already proscribed conduct. This Court finds no merit to this argument.

one of the activities at which the statute is aimed. Thus, the federal crime continued until the re-zoning was accomplished on July 25, 1962."[21]

United States v. Borelli, 336 F.2d 376 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1964), involved an analogous issue. The court dismissed a defendant's contention that he was wrongfully sentenced to ten years for the offense of conspiracy added to 21 U.S.C. § 174 after the defendant had become engaged in the unlawful activity. At the time of the commencement of the criminal activity, it was also a crime to conspire to violate 21 U.S.C. § 174; however, the maximum punishment was five years. The court stated that the increased punishment was not *ex post facto*, unless the jury was convinced that the defendant had withdrawn from the conspiracy before the statute's effective date. (336 F.2d at 386, n. 5). The court also noted that it was incumbent upon the defendant to establish his withdrawal from the conspiracy by affirmative action. (336 F.2d at 388).[22]

▮ Thus, certain principles are well established. The concept of conspiracy is that of a continuing crime, and once its existence is established, it is presumed to continue. United States v. Bentvena, 319 F.2d 916, 928 (2d Cir. 1963), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); United States v. Ogull, 149 F.Supp. 272, 274

(S.D.N.Y.1957), aff'd sub nom. United States v. Gernie, 252 F.2d 664 (2d Cir. 1958), cert. denied 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958). It continues until its objects are attained. United States v. Corallo, *supra* at 1319–1320. Membership in a conspiracy is also presumed to continue unless the contrary is proven by the party charged with membership. United States v. Cantone, 426 F.2d 902 (2d Cir. 1970), cert. denied 400 U.S. 827, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970); United States v. Bentvena, *supra* at 928; United States v. Ogull, *supra* at 274. Mere cessation of activity in furtherance of the conspiracy is not sufficient to carry the burden of proving withdrawal. United States v. Goldberg, 401 F.2d 644, 648 (2d Cir. 1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790; United States v. Borelli, *supra* at 388. Each member of a conspiracy is chargeable with acts performed by other members in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1940). Therefore, it is incumbent upon each member of a conspiracy to establish by affirmative proof his withdrawal from the conspiracy. United States v. Markman, *supra* at 576; United States v. Borelli, *supra* at 388.

▮ It has been established conclusively and beyond a reasonable doubt that the defendants entered into a conspiracy to use an extortionate means to collect an

21. *See also* United States v. Corallo, 413 F.2d 1306 (2d Cir. 1969), cert. denied 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969). In citing *Wechsler*, the court stated:

"... [W]hile an indictable offense may have been committed at an early stage in the conspiracy, the conspiracy itself continues until its objects are attained, that being the completion or consummation of the crime." (413 F.2d at 1319–1320).

22. *See also* United States v. Ogull, 149 F. Supp. 272 (S.D.N.Y.1957), aff'd sub nom. United States v. Gernie, 252 F.2d 664 (2d Cir. 1958), cert. denied 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958), wherein it was stated:

"It is well established that a statute which increases a penalty with respect to a conspiracy which commenced prior to but was carried on and continued beyond the effective date of the new act does not violate the constitutional prohibition against *ex post facto* laws. This is because the concept of conspiracy is that of a continuing crime; hence the new statute applies with respect to criminal acts accomplished after the effective date. Furthermore, once membership in a conspiracy is proved, there is a presumption that membership continues unless there is affirmative evidence of withdrawal." (149 F.Supp. at 274).

extension of credit. The conspiracy is presumed to continue until affirmative evidence of withdrawal is adduced or until the object of the conspiracy is achieved. With regard to withdrawal, not only is the record barren of evidence indicating even attempted withdrawal by any of the defendants, but the facts prove that conduct in furtherance of the conspiracy was engaged in after May 29, 1968.[23] Moreover, it has been proven that the purpose of the conspiracy was not achieved until after May 29, 1968,[24] and the crime was incomplete on that date. The activities of the defendants in collecting payments from the Clydes were in furtherance of their conspiratorial purpose and such activities extended well beyond the effective date.[25]

Rather than affirmatively withdraw from the conspiracy, the defendants reaffirmed their participation in the wrongful conspiratorial scheme with each collection of money from the Clydes after the effective date. They certainly did not conform their conduct to the requirements of the Consumer Credit Protection Act, but rather they disregarded it and continued in their wrongful scheme. United States v. DeStafano, *supra* at 347.

Defendants argument is to the effect that on the effective date of § 894, they automatically ceased to be participants in any scheme to collect extensions of credit through extortionate means. Their argument is totally unfounded. The defendants clearly are not being punished for their conduct prior to the effective date of § 894. In lieu of good faith adherence to the new federal standards, the defendants continued their culpable conduct and attempted to reap its benefits. To allow them to do so would be to frustrate the purposes of Congress in enacting the Consumer Credit Protection Act and to abuse the protections which the *ex post facto* and due process clauses afford.

Therefore, the Court finds the defendants, Jesse Smith and Rocco Lauria, guilty on Count Nine of the Indictment beyond a reasonable doubt, and the Court further finds that Counts One through Eight must be dismissed, however, without prejudice against the Government using the facts surrounding the said Counts as evidence in their burden of proving Count Nine of the Indictment, and it is ordered that the defendants and their attorneys appear before the Court on April 11, 1972, at 10:00 A.M., at which time the Court shall pronounce judgment and make rulings on the motions of the defendants, and for such other and further proceedings that may be necessary.

23. The evidence indicates that Carvelli, acting as the collection agent for Smith and Lauria, received payments from the Clydes on eight occasions after the effective date; it also indicates that the payments were in turn remitted to the two principals after the effective date. The defendants have offered no evidence in this case, either by testimony or by exhibits.

24. The purpose of the conspiracy was in fact never ultimately achieved since the Clydes fled before they completed their payments.

25. *See* United States v. Wechsler, *supra*, 392 F.2d at 346. The overriding purpose of the Consumer Credit Protection Act was to safeguard the consumer in connection with the utilization of credit.

Included in this purpose was the desire to protect the consumer from being forced to make credit repayments through extortion. U.S. Code Congressional and Administrative News, 90th Cong.—2d Sess. at 1962–2030 (1968). In *Wechsler*, the wrong which the statute involved sought to eliminate was not achieved until the rezoning was accomplished; that is, the wrongful conduct of the defendants continued until the purpose of their conspiracy was achieved. In the present case, one of the wrongs sought to be abolished by § 894, the repayment of credit because of extortion, could not be achieved until the collections were completed. Thus, the wrongful conspiratorial conduct of the defendants continued with each collection.