**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bernard MARCHESANI, Defendant-
Appellant.**

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Clarence STEPHANS, Defendant-
Appellant.**

**Nos. 71–1620 and 71–1621.**

United States Court of Appeals,
Sixth Circuit.

April 5, 1972.

Philip Gillis, Detroit, Mich., for defendants-appellants; Louisell & Gillis, Detroit Mich., on brief.

Shirley Baccus-Lobel, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellee; Sidney Glazer, Atty., Dept. of Justice, Washington, D. C., James H. Brickley, U. S. Atty., Detroit, Mich., on brief.

Before PECK, McCREE and BROOKS,* Circuit Judges.

JOHN W. PECK, Circuit Judge.

Defendants-appellants Marchesani and Stephans were convicted under Count I of a four-count indictment which charged them with conspiring to use extortionate means in attempting to collect an extension of credit in violation of 18 U.S.C. § 894.[1] Marchesani was also found guilty under Count III of the indictment which charged the use of extortionate means on or about October 30, 1968, in attempting to collect an extension of credit. Verdicts of acquittal were returned by the jury in the trial court as to Counts II and IV. Both appellants were sentenced to twenty-years imprisonment under Count I and Marchesani received an additional twenty-year sentence under Count III, the sentences to run concurrently. They raise seven issues for reversal on this appeal.

The convictions herein stem from Marchesani's and Stephans' alleged participation in the so-called "juice" racket. The "juice" racket involves the extension of loans to individuals at illegal interest rates followed by the use of fear tactics to coerce the victims into paying the interest, or "juice," when due. The victim in the present case, as charged in the indictment, was one Phillip Jebrail, who borrowed money on a series of loans evidenced by notes from Marchesani from 1964 through 1968. The period of the conspiracy was stated in the indictment to run from December 1, 1965, to March 6, 1969, as this was the period during which Marchesani was alleged to have conspired with Stephans and with a third co-conspirator, Salvatore Agosta, to extort the illegal interest from Jebrail. Agosta was not named as party defendant in the present case because, according to the Government, there was no evidence that he continued to participate in the conspiracy past the date of enactment of 18 U.S.C. § 894, which was May 29, 1968.

Jebrail testified at trial that he paid the illegal interest to Marchesani until sometime in 1966, when Agosta began making the collections. Then in the spring of 1967, Stephans started working with Marchesani in collecting the money and this continued into 1969. The testimony at trial indicated that Jebrail paid the following approximate amounts as interest over this period: $3,530.00 in 1965, $12,790.00 in 1966, $21,180.00 in 1967 and $24,500.00 in 1968.

For each of the loans during the above period, Jebrail was paying interest at the rate of 10% per month. Appellants had him sign notes for the loans, however, which reflected an interest rate of 6% annually. Prior to 1967, the notes had been returned to Jebrail upon repayment of a loan. Beginning in that year, the procedure was changed and either Marchesani or Stephans would destroy the note of a repaid loan in Jebrail's presence. Several times they showed the appropriate note to Jebrail and then burned it. On one occasion, Stephans and and Jebrail went to the washroom of a restaurant where Stephans tore up one of the notes and flushed it down a toilet.

Jebrail stated that during this period, Marchesani and Stephans conveyed numerous implied and direct threats to him which put him in a state of fear as to the safety of both himself and his family. At times, Marchesani and Stephans informed him of the fate of other persons who had failed to make similar interest payments.

One such incident which was related to Jebrail involved threats made to another victim, Ed Scott and his family.

---

* Honorable Henry L. Brooks died on December 30, 1971.

1. "§ 894. Collection of extensions of credit by extortionate means

"(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or
(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both."

Marchesani and Stephans told Jebrail that when Scott was delinquent in his payments, they went to his house and put a gun "on his head." They slapped Scott and made threats against his wife. Scott thereupon promised to keep his payments current. Jebrail stated that after being informed of this incident he felt fear and anxiety for himself and his wife. Mrs. Scott testified at trial concerning the loans which she and her husband had made from Marchesani and confirmed that he and some other men had come to their place of business and made threats against them.

Another of the incidents testified to by Jebrail occurred on August 15, 1968. On that date, Jebrail went to Marchesani's house to discuss a payment of $1,300.00 which was due four days later. He testified that Marchesani warned him:

"You're going to pay that money or you're dead. You see what happened to Louis Silas. Both of his eyes are still black and his face will never be the same. He wound up in the hospital, and he'll still have to pay the money. Worse things can happen to you. You've got a nice family and a couple of kids."

Thereafter, around October 30, 1968, Jebrail again met with Marchesani and Stephans concerning the payment of interest on the loans. He testified that Marchesani again told him:

" * * * [Y]ou know you got to pay or you're dead. There's no way out. * * * Remember what I told you about Silas. He still isn't right. There's a lot of worse things. You've got a nice family and you got two nice kids. * * * Just try to bring it down and get the money or you're dead."

Jebrail testified that at this point he was desperate and had nowhere to turn. He was continually late in the interest payments and had no way of obtaining the money to make them. He stated that out of fear for the safety of himself and his family, he decided to contact the Federal Bureau of Investigation whose subsequent investigation of the case led to the present prosecutions.

At trial, the defense attempted to show that Jebrail went to the F.B.I., not out of fear of reprisals by Marchesani and Stephans, but rather with an offer to testify against them in order to avoid a pending federal prosecution against him for use of interstate facilities in connection with bookmaking operations. Jebrail was questioned extensively by both the prosecution and the defense in the present case as to these gambling activities. He admitted that throughout the entire period of the alleged extortion herein, he was a heavy gambler, engaged primarily in race track betting, and that he needed the loans from Marchesani to finance these activities. Although he was never employed during these years, he was receiving a pension from the Federal Government for an illness he sustained as a member of the Armed Services during World War II. Jebrail's family also was receiving income from his wife's job.

Accompanying the gambling charges against Jebrail was a forty-three page affidavit which purported to detail Jebrail's activities with a particular bookmaker. At one point in the cross-examination of Jebrail by defense counsel, the Government objected to use of the affidavit in the framing of the questions. The District Court sustained the objection and limited the cross-examination by refusing to permit "a line by line detailed examination of the contents" of the affidavit and stated that Jebrail's background and his activities during the period of the affidavit had already been fully explored. The Court ruled that any facts relevant to the testimony of Jebrail could be pursued, but that defense counsel would not be permitted to, in effect, put the witness on trial for these other charges due to the possibility of confusion of the issues in the minds of the jurors.

Also brought out at trial was Jebrail's extensive involvement with fraudulent schemes through which he sought to se-

cure the funds to pay Marchesani and to gamble. In one such scheme, Jebrail would purchase television sets on credit and then sell them as "hot" or stolen merchandise. He admitted that in the latter part of 1968 when he was so fearful of what Marchesani would do to him, he was willing to and did resort to any new way to steal or rob to get the money necessary for the payments. These schemes were fully exposed in detail during trial.

## I.

We turn now to the arguments pressed by Marchesani and Stephans in this Court. They first contend that the indictment in the present case was defective because it charged the existence of a conspiracy commencing prior to the effective date of 18 U.S.C. § 894 and was, therefore, an attempt to apply that statute retroactively. As previously stated, Section 894 became law on May 29, 1968. Yet, at trial, testimony of events occurring as early as 1964 was introduced to establish the conspiracy between Marchesani, Stephans and Agosta as charged in Count I of the indictment.

■ We cannot agree that receipt of this evidence effected a retroactive application of the statute. The indictment itself alleged the occurrence of two overt acts, one by Marchesani on or about October 30, 1968, and the other by Stephans on or about November 14, 1968, to show that the conspiracy continued after the statute was passed. Moreover, the District Court repeatedly reminded the jury during trial that an essential element of the conspiracy charge required a finding that during the existence of the conspiracy, one of the overt acts alleged was knowingly committed by one of the conspirators in furtherance of some object or purpose of the conspiracy. The Court instructed the jury as follows:

" * * * [T]he statute that is alleged to have been violated in count one * * * is Title 18 of the United States Code, Section 894, which be-

came effective May 29, 1968. Therefore, in order to find either of the defendants guilty of count one, you must find that some overt act in furtherance of the conspiracy charged was committed after May 29, 1968."

Marchesani and Stephans concede that admission of evidence of the loans which were made prior to the enactment of the statute in question was proper. *See* United States v. Biancofiori, 422 F.2d 584 (7th Cir. 1970); United States v. Curcio, 310 F.Supp. 351 (D.C.Conn. 1970). They contend, however, that any evidence of the conspiracy to extort the illegal interest from Jebrail prior to the date of the statute should have been excluded because it is possible that the jury's verdict could have been based upon this evidence. In making such argument, they ignore the decision of this Court in Nyquist v. United States, 2 F.2d 504 (1924), cert. den., 267 U.S. 606, 45 S.Ct. 508, 69 L.Ed. 810 (1925), which we regard as being exactly on point.

*Nyquist* involved a prosecution for conspiracy to violate the National Motor Vehicle Theft Act, popularly known as the Dyer Act, which enactment became effective on October 29, 1919. Evidence was adduced at trial to show formation of a conspiracy in July, 1919, which conspiracy continued through December of that year and for sometime thereafter. All of the overt acts charged in the indictment occurred subsequent to the October 29 date.

On appeal it was argued that the admission of testimony of acts occurring prior to the date the Dyer Act took effect constituted error. This Court responded:

"It was permissible to show that the fraudulent agreement was entered upon long before the Dyer Act took effect, and was kept up after the passage of that act. Heike v. United States, 227 U.S. 131 at page 145, 33 S.Ct. 226, 57 L.Ed. 450, Ann.Cas. 1914C, 128. * * * [I]f after that act took effect the parties to the conspiracy not only did not withdraw

from it, but consciously continued in its prosecution, * * * the parties thereto would be as guilty as if the conspiracy was first formed on or after October 29, 1919.

\* \* \* \* \* \*

"There was substantial testimony tending to support a finding of each of the facts referred to as sustaining a conviction. Under the court's charge, which is not in terms assailed, conviction was permissible only upon such finding. We therefore think the court rightly admitted, and so rightly refused to strike out, the testimony of acts and transactions occurring before October 29, 1919, and although not set forth in the indictment." 2 F.2d at 505.

As in *Nyquist*, the evidence in the present case was sufficient to establish the formation of a conspiracy prior to the date of the statute and its continuation well past that date, which continuation was manifested by evidence supporting the occurrence of the overt acts listed in the conspiracy charge. In this regard, Marchesani was convicted for commission of one of the same acts listed in the conspiracy charge.

The Fourth Circuit had occasion recently to consider a claim similar to the one under consideration herein. In United States v. Wechsler, 392 F.2d 344, cert. den., 392 U.S. 932, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968), the appellants were charged with conspiracy to violate 18 U.S.C. § 1952(a) (3), which statute had been enacted into law September 13, 1961. Although the conspiracy was begun prior to September, 1961, it was not completed until July 25, 1962. Recognizing the presence of an ex post facto problem, the Court decided that this was not a ground for reversal of the convictions because the conspiracy was shown to have continued past the effective date of the statute. The Court said, "Each of the overt acts listed in the indictment were acts which would have furthered this conspiracy and each was performed after the statute was enacted and before the conspiracy ended * * *." 392 F.

2d at 347. The conspiracy to violate federal law was acknowledged to be a continuing offense, the furtherance of which was manifested by the occurrence of acts subsequent to the passage of the statute. As previously stated, the same was true in the present case and we find no ex post facto problem in the admission of evidence of acts prior to the date of the statute to establish the formation and continuation of the conspiracy. *See* Bailey v. United States, 5 F.2d 437 (5th Cir. 1925); United States v. Kubacki, 237 F.Supp. 638 (E.D.Pa.1965).

II.

We next consider appellants' second argument for reversal of their convictions wherein they contend that the trial court erred in admitting evidence of other similar criminal transactions of crimes not charged in the indictment. Appellants cite in particular the testimony of Mrs. Scott descriptive of the incidents and conversations she and her family had with Marchesani and Stephans in 1967, whereby the Scott family was put in fear for non-payment of outstanding loans. Other testimony, by Jebrail, had revealed that he had been informed of the threats against Mrs. Scott and her family and that he (Jebrail) was fearful for his own safety because of his knowledge of the threats.

That the incidents of fear tactics used by Marchesani and Stephans against others are admissible is clear from the statute itself. The indictment in this case alleged that appellants used "extortionate means" in attempting to collect an extension of credit from Jebrail; and 18 U.S.C. § 891(7) defines "extortionate means" as "any means which involves the use, or an express or *implicit threat* of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person." (Emphasis supplied.) Furthermore, 18 U.S. C. § 894(b) provides:

"(b) In any prosecution under this section, for the purpose of showing an *implicit threat* as a means of collection, evidence may be introduced tend-

ing to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means." (Emphasis supplied.) Thus, the statute expressly states that evidence of extortionate means applied to others and made known to the victim as in the instant prosecution may be introduced at trial.

■ In House Conference Report No. 1397, which reported on the purpose of this provision as part of its legislative history, it was stated:

" * * * Section 894(b) merely codifies a principle of evidence which already appears to be recognized in the case law, but whose importance in this area is sufficiently great to make it desirable to leave no doubt whatever as to its applicability. It allows evidence as to other criminal acts by the defendant to be introduced for the purpose of showing the victim's state of mind. * * * " 2 U.S.Cong. & Admin.News p. 2028 (1968).

We can see that Congress wanted to insure, by the inclusion of Section 894(b), that the federal decision law of extortion was incorporated into this statute for purposes of proof of implicit threats at trial. United States v. Curcio, 310 F. Supp. 351, 356–357 (D.C.Conn.1970). Under the pertinent federal cases on this subject, it is well established that evidence of similar acts against other persons, which were known by the victim to have occurred, are admissible to show generation of the element of fear in the victim. United States v. Tropiano, 418 F.2d 1069, 1081 (2d Cir. 1969), cert. den., 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970); Carbo v. United States, 314 F.2d 718, 740–745 (9th Cir. 1963), cert. den. sub nom., Palermo v. United States, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964); United States v. Palmiotti, 254 F.2d 491, 495 (2d Cir. 1958); Bianchi v. United States, 219 F.2d 182, 189–190 (8th Cir. 1955), cert. den., 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955). We therefore conclude that admission of this kind of evidence in the present case was proper, with appropriate limiting instructions, to show the state of mind of the victim as well as to show the motive or intent of the accused.

The District Court gave cautionary instructions to the jury with respect to the use to be made of this evidence repeatedly during the trial. Regarding Mrs. Scott's testimony, the District Court stated to the jury:

"Now when you come to deliberate, you will give that testimony such credence as you think it deserves, but remember it only goes to the motive and intent of the defendants and to the frame of mind induced thereby, and it's not to be taken as substantive proof that those things allegedly happened.

"The defendants aren't on trial for those things. * * * "

Such limiting instruction, while not eliminating all possible prejudice accompanying the testimony, at the very least placed its admission within the bounds contemplated by Congress in the enactment of Section 894(b) and we find no error was committed.

### III.

A third issue raised by appellants on this appeal alleges that the trial judge was unduly restrictive in his limitation of the defense's cross-examination of Jebrail. At one point during the cross-examination of Jebrail, the defense began questioning him concerning the charges brought against him in the early part of 1968 for his alleged activities as a bookmaker. These charges were dismissed by the Government sometime prior to the trial in the instant case and the defense was attempting to show that Jebrail had originally contacted the F.B.I. with an offer to testify if the charges were dropped and that Jebrail's

subsequent testimony was the result of such an agreement.

Sometime during the trial proceedings, the Government objected to any direct reference by the defense to the 43 page affidavit which supported the prior charges against Jebrail. In ruling upon the objection, the Court recognized that it was required to decide between several conflicting principles. On the one hand was the right of the defense to attempt to show that the witness had been "bought and paid for", and on the other was the fact that only an indictment and complaint were involved and that any detailed probe of these other charges would increase the possibility of confusion of the issues in the minds of the jurors. The Court stated to counsel:

> "What you get into when you start getting into the prior indictment, and particularly into the prior affidavit, * * * is a trial of the witness on the stand, and it results in utter confusion for the jury.

> "At the same time if [the indictment] is not permitted to be shown in any way, I think there's been unfairness to the defendants.

> * * * * * *

> "Now, this Court has attempted to reach a compromise between those two views. I have said that we will permit and we have permitted the jury to know that there's been a prior indictment, but I have drawn the line on going into the particulars to the degree that they are exemplified in the complaint for the warrant of arrest.

> * * * * * *

> "The mere fact that some vital, relevant point, vital and relevant to the testimony of this witness also appears in the affidavit shouldn't close the door to it, but that doesn't mean that the door is open to a sled-length examination of the * * * affidavit for the warrant."

At a later point in the trial, the defense asked Jebrail on cross-examination whether he was worried or concerned about the prior indictment at the time he contacted the F.B.I. Jebrail stated that he was not worried about it because he had never been a bookmaker. The defense then requested permission from the Court to impeach Jebrail's testimony by reference to the 43 page affidavit and the Court refused to allow it, ruling that the defense was bound by Jebrail's answers to the previous questions. Appellants urge that this ruling was error.

 The scope of cross-examination allowed with regard to particular lines of inquiry at trial is within the sound discretion of the trial court, and its rulings thereon may not be disturbed unless an abuse of discretion is shown. Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. Mills, 366 F.2d 512, 516 (6th Cir. 1966). A great deal of testimony bearing upon the credibility of Jebrail was put before the jury. They were apprised in detail of his heavy involvement in gambling, of his considerable participation in numerous fraudulent schemes, and of the facts that he had been indicted as a bookmaker, that he contacted the F.B.I., and that the charges were ultimately dismissed. The District Judge was warranted in his prohibition of any detailed consideration of the charges against Jebrail due to the risk of confusion of the issues and, when viewed in this light, the limits placed on the cross-examination were entirely within the District Court's discretion.

 Appellants also take exception to a ruling of the trial court disallowing testimony purporting to show that a prosecution witness, Mrs. Scott, was cohabitating with a man who was not her husband. The trial court excluded this testimony because it had no bearing on any issue in the case and would only serve to unnecessarily "rake over" the witness on the stand. This ruling does not constitute an abuse of discretion by the Court. Rather, the Court had a duty to protect the witness from undue harassment upon cross-examination under the above circumstances. *See* Alford v.

United States, *supra*, 282 U.S. at 694, 51 S.Ct. 218.

## IV.

■ The final issue discussed herein has to do with the District Court's instruction to the jury relative to the preparation and destruction of the promissory notes, which covered the loans made to Jebrail. The Court stated to the jury:

"Now, there is evidence, which if believed, would tend to show the destruction on the part of both the defendants Marchesani and Stephan of certain notes reflecting loans made. There is also evidence which, if believed, would tend to show that the notes were made for amounts of interest other than that which the witness said he paid. If you believe this evidence, you may conclude that the defendants on different occasions, either fabricated or destroyed such notes.

"The fabricated or destruction of documentary evidence may either be regarded by you as evidence of a guilty conscience or as an innocent act, depending upon your view as to all the surrounding facts and circumstances."

The evidence to which the District Court referred in this instruction indicated that for each loan, Jebrail was given a promissory note bearing an interest rate of 6% per year when actually Jebrail was being charged interest at the rate of 10% per month. Jebrail testified that beginning sometime in 1967, either Marchesani or Stephans would destroy the notes rather than return them. Evidence of a variance between the stated and actual interest rates of such notes, followed by their destruction upon repayment under the circumstances in this case, could well have been construed by the jury as establishing a guilty conscience on the part of appellants and as showing an awareness by them of the fact that the transactions which the notes represented were illegal.

It was proper to instruct the jury on how they might consider such testimony. There was no question as to the contents of the notes and therefore the instruction simply informed the jury what inference could be drawn from the evidence regarding spoliation of the notes. This cannot be said to be unfairly prejudicial to appellants. *See* United States v. Wilkins, 385 F.2d 465, 472 (4th Cir. 1967), cert. den., 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1144 (1968).

## V.

Appellants raise other issues in this proceeding, one alleging prejudice due to continuance of their trial over the Thanksgiving holidays, another stating that a supplemental instruction given to the jury had a tendency to coerce the jury's verdict, and finally that the sentence imposed by the trial court upon the appellants violated due process. We find no merit in any of these allegations and in view of the previous consideration of the issues in the present case, the judgment of the District Court is affirmed.