**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jesse SMITH and Rocco Lauria,
Defendants-Appellants.**

**Nos. 861, 872, Dockets 72–1405, 72–1515.**

United States Court of Appeals,
Second Circuit.

Argued June 9, 1972.

Decided July 13, 1972.

Eugene M. Propper, Washington, D. C. (Robert A. Morse, U. S. Atty., for the E. D. N. Y., Richard L. Shanley, Special Atty., Dept. of Justice, Roger Pauley, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Jonathan L. Rosner, New York City, for appellant Smith.

Marvin Zevin, Mineola, N. Y. (Bracken & Sutter, Mineola, N. Y., on the brief), for appellant Lauria.

Before FRIENDLY, Chief Judge, and LUMBARD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

These are appeals from judgments of conviction entered in the United States District Court for the Eastern District of New York on April 5, 1972. Appellants Jesse Smith and Rocco Lauria were convicted of conspiring to use extortionate means to collect an extension of credit in violation of the federal loan sharking statute, 18 U.S.C. § 894,[1] and

---

1. Title II of the Consumer Credit Protection Act, 82 Stat. 159, 18 U.S.C. §§ 891– 96 (1968) proscribes three types of extortionate credit transactions: the mak-

each was sentenced to three years imprisonment. The appellants waived their right to a jury trial and stipulated that the court could consider the statements of the government witnesses plus exhibits referred to in the statements as all of the evidence in the case as if the same had been presented in open court at a trial before the court sitting without a jury. The apparent reason for this procedure was that the defendants did not contest the facts but relied on the contention that the prosecution violated the *ex post facto* clause of the constitution (Art. I, § 9 cl. 3) and the due process provision of the fifth amendment. Judge Anthony J. Travia in his Findings of Fact and Conclusions of Law, United States v. Carvelli, 340 F. Supp. 1295 (E.D.N.Y.1972), found the defendants guilty of the conspiracy count but dismissed the eight substantive counts.[2] We affirm the judgments of conviction.

After Howard Clyde purchased an auto repair shop, he encountered serious financial problems and soon became the victim of a sordid loan sharking operation in October, 1967. He initially borrowed $1250 from Lauria whose collector was Carvelli.[3] The "vig" (vigorish or excessive interest) was $1000 with weekly payments scheduled to terminate in February, 1968. Clyde was still deeply in debt and in January, 1968 he was advised by one Lombardi, who initially acted as a collector for appellant Smith, that a $2000 loan might be possible if Smith was agreeable. Carvelli was disturbed by the prospect of losing this business, and the problem was solved by Carvelli providing Clyde with $2000 with Lauria and Smith each providing a $1000 investment. The terms of this deal were that the hapless Clyde was to pay back $6000 over a 40 week period so that the "vig" was a mere $4000. Carvelli gradually emerged as the sole collector for both Lauria and Smith, visiting Clyde's shop every week in February and March of 1968 accompanied by either one of the appellants. On April 10, 1968 Smith and Lauria accompanied Carvelli to Clyde's shop, and Lauria claimed that he was still owed an installment on his half of the loan. Both Lau-

ing and financing of extortionate extensions of credit, 18 U.S.C. §§ 892–93, and the collection of extensions of credit by extortionate means, 18 U.S.C. § 894. We are here concerned with the latter transaction, and the statute provides in relevant part:

"§ 894. Collection of extensions of credit by extortionate means

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means."

18 U.S.C. § 891(7) defines as extortionate means as

. . . any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person."

The constitutionality of this statutory scheme has been upheld as within Congress' power under the Commerce Clause to control activities affecting interstate commerce. Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

2. The indictment filed October 22, 1969 charged appellants with eight substantive violations of the statute alleging that on the eight postenactment meetings between Carvelli and Mrs. Clyde (described infra) the appellants "explicitly threatened" the Clydes. Judge Travia dismissed these counts on the ground that there was no evidence in the record of explicit threats on these occasions.

3. Vincent Carvelli pled guilty to the conspiracy charge on January 11, 1972 and was sentenced to three years probation and fined $500.

ria and Smith threatened at this time to burn down Clyde's shop as well as his home if he didn't pay. The appellants further stated that Carvelli was to collect all future payments in cash. Mrs. Clyde came into the shop and was menaced by Lauria. Clyde at this point was financially desperate. He was forced to sell his shop and find other employment which he sought to hide from the appellants.

On May 8, 1968 Lauria and Smith came to Clyde's home in his absence and told Mrs. Clyde, "We intend to collect our money." Smith commented that he knew where Clyde was working and where the children were attending school. Smith, noticing that the Clyde's four year old child had a bandaged arm, remarked "It would be bad if something of this sort happened to his face." The Clydes were now in utter fear and determined to continue the payments at all costs. However, Carvelli was asked never to come to the house, and an arrangement was made to make future payments at a local cocktail lounge where Carvelli was employed.

Up to this point, no matter how revolting and repugnant the conduct of the appellants and even though criminal under state law,[4] it was not violative of any federal law. The Consumer Credit Protection Act did not become effective until May 29, 1968. In view therefore of the *ex post facto* problem it becomes crucial to examine the events which transpired after the effective date of the statute.

On or about May 30, June 6, June 13, June 20, June 27, July 3, July 10 and July 17, 1968, Mrs. Clyde made cash payments to Carvelli at the Cadillac Lounge in Smithtown, New York. Mrs. Clyde was usually accompanied by a friend because of her nervousness and apprehension.

Before the end of the school year the Clydes sent their children to reside with out-of-state relatives. In late July, 1968 the Clydes fled from their home in the middle of the night to escape further payments and possible harm.

Carvelli turned over his weekly cash collections to either Smith or Lauria, whoever came to his bar first. Smith complained about not getting his full share, and both Smith and Lauria separately advised Carvelli that they would have to get together to straighten the matter out. In the summer of 1968, after the Clydes had fled from their home, Smith stated to Carvelli, "I got left holding the bag."

The principal contention of the appellants here is that since the agreement between Smith and Lauria with Clyde as well as the actual threats made by them against the Clydes, all predated the effective date of the statute and hence were federally "innocent", their post-statutory behavior was insufficient to establish a conspiracy to violate 18 U.S. C. § 894. We cannot agree.

■ The contention that the agreement by Lauria and Smith to make loans at usurious rates was entered into prior to the effective date of the statute while true, is not pertinent. The appellants were not charged or convicted of entering into an illicit agreement but rather of conspiring to collect extensions of credit by extortionate means. Mr. Justice Holmes a long time ago distinguished between the transitory character of an agreement and the continuous nature of the conspiracy which follows. In differentiating between a contract in restraint of trade and a conspiracy in restraint of trade, he pointed out, "A conspiracy is constituted by an agreement, it is true, but it is the result of the agreement, rather than the agreement itself, just as a partnership, although constituted by a contract, is not the contract, but is a result of it. The contract is instantaneous, the partnership may endure as one and the same

---

4. See N.Y. Penal Law §§ 155.05 (2) (e) & 190.40 (McKinney's Consol.Laws, c. 40, 1967). It should be noted that 18 U.S.C. § 896 specifically provides that the federal statute was not intended to preempt any state laws proscribing like conduct.

partnership for years. A conspiracy is a partnership in criminal purposes." United States v. Kissel, 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910). The distinction between the agreement giving rise to the enterprise and the conspiracy which ensues and is continuous until the criminal purpose has been achieved is well understood. Pinkerton v. United States, 328 U.S. 640, 646–647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); Developments in the Law —Criminal Conspiracy, 72 Harv.L.Rev. 920, 926 (1959).

It is well established that evidence of the prestatutory behavior of the conspirators even though innocent is admissible. In United States v. Ferrara, 458 F.2d 868 (2d Cir. 1972) this court considered an appeal from a conviction of a conspiracy to violate a 1959 Taft-Hartley Act amendment, 29 U.S.C. § 186. The court held,

> "Furthermore, the trial judge did not commit reversible error in admitting evidence relating to the period before the statute was amended. Such evidence was admissible to show the existence and purpose of the conspiracy, as well as to prove the intent and purpose of the conspirators' later acts. In view of the fact that the conspiracy continued long after 1959, evidence of prior acts was both admissible and necessary to enable the trial judge to appreciate fully the reasons for the payments made after 1959." Id. at 874.

Accord, United States v. Binder, 453 F. 2d 805, 808 (2d Cir. 1971), cert. denied, 407 U.S. 920, 92 S.Ct. 2458, 32 L.Ed.2d 805 (U.S.1972); United States v. Russo, 442 F.2d 498, 501 (2d Cir. 1971), cert. denied, 404 U.S. 1022, 92 S.Ct. 669, 30 L. Ed.2d 673 (1972).

■■ Appellant seeks to escape the force of *Ferrara* and comparable holdings by urging that the pre-statutory behavior held admissible in those cases did violate some federal criminal statute which was later amended and under which defendants were indicted. They assert in effect that the partnership innocent *in limine* cannot become subsequently tainted. This argument finds no support in logic or authority. None of the cases permitting the court to consider the pre-enactment behavior of the conspirators, was based on the fact that it was violative of some other federal statute at the time. The reason it was admitted was to assist the trier of the fact to determine the existence and purpose of the conspiracy and to illumine the intent and purpose of the post-enactment behavior. The defendants are not being punished for such pre-statutory behavior, in any event, so that no *ex post facto* problem arises.

The pre-enactment behavior here was hardly innocent; it was *malum in se* and violated state law. Nyquist v. United States, 2 F.2d 504 (6th Cir. 1924), cert. denied, 267 U.S. 606, 45 S. Ct. 508, 69 L.Ed. 810 (1925) is closely in point. The defendants there were charged with conspiring to violate the National Motor Vehicle Theft Act (Dyer Act) which became effective on October 29, 1919. There was no federal legislation at all in this area prior to this enactment. In rejecting the argument that pre-enactment evidence violated the *ex post facto* doctrine the court said:

> "It was permissible to show that the fraudulent agreement was entered upon long before the Dyer Act took effect, and was kept up after the passage of that act . . . . The conspiracy charged was not only morally wrong, but was presumably punishable under state statutes previous to the Dyer Act; and if after that act took effect the parties to the conspiracy not only did not withdraw from it, but consciously continued in its prosecution, . . ., the parties thereto would be as guilty as if the conspiracy was first formed on or after October 29, 1919." Id. at 505 (citations omitted).

**1134**

The most recent case in point involving the very statute at issue here is to the same effect. United States v. Marchesani, 457 F.2d 1291 (6th Cir. April 5, 1972).

The appellants further urge that their convictions should be reversed because there is no evidence they made any threats to the person or property of the Clydes after May 29, 1968, the effective date of the statute. The gravamen of the § 894 offense, the argument runs, is the use of extortionate means in the course of loan collections, and since there is no proof in this case of any threats since the April and early May incidents, they are, in effect, being punished for threats made prior to the time it was illegal to do so. Once again we find the argument to be without merit.

The case upon which appellants place major reliance for the proposition that the use of extortionate means represents the corpus delicti is United States v. Biancofiori, 422 F.2d 584 (7th Cir.), cert. denied, 398 U.S. 942, 90 S.Ct. 1857, 26 L.Ed.2d 277 (1970). We do not quarrel with the proposition at all but point out that in that case the defendant was charged with the completed crime under § 894 and not the conspiracy to violate § 894 which is also made criminal by that section. The distinction between the use of extortionate means (the completed crime) and the conscious planning and conniving in partnership to employ such means (the inchoate crime of conspiracy) is basic. See Carbo v. United States, 314 F.2d 718, 740–741 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964).

Appellants urge however that in this case the indictment set forth three post-enactment overt acts (the collections on June 6, June 13 and July 10, 1968) no one of which was shown to have been accomplished by the use of any actual or explicit extortionate means. There are several answers to the suggestion that this constitutes a basis for reversal.

 In the first place, this was not an indictment under the general conspiracy section, 18 U.S.C. § 371, which requires the proof of overt acts in a prosecution under that section. This was an indictment under 18 U.S.C. § 894 which provides both for the completed crime as well as the conspiracy and under such a statute there is no necessity to set forth overt acts in the indictment. Singer v. United States, 323 U.S. 338, 340, 65 S.Ct. 282, 89 L.Ed. 285 (1945); United States v. Tolub, 187 F.Supp. 705, 709 (S.D.N.Y.1960), aff'd, 309 F.2d 286 (2d Cir. 1962). That overt acts were unnecessarily pleaded here does not add to appellants' argument, since the function of the overt act in a conspiracy indictment and trial is simply to manifest that the conspiracy is at work. The overt act pleaded need not even be criminal. Yates v. United States, 354 U.S. 298, 334, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). The court, in any event, is not limited in its examination of post-enactment conduct to that set forth in the indictment in determining whether appellants adhered to their initial agreement. See United States v. Armone, 363 F.2d 385, 400–401 (2d Cir.), cert. denied, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303 (1966).

██ We refuse to read Section 894 as requiring that each collection be accompanied by an overt threat.[5] We have already established that the pre-enactment conduct of the conspirators is admissible to explain the intent and purpose of their subsequent behavior. Here there were unquestioned brutal threats

5. The serious concern of Congress with the national problem of loan sharking is evidenced by the broad definition of "extortionate means" in 18 U.S.C. § 891(7) which includes the use of "implicit threats", and 18 U.S.C. § 894(b) permits proof of implicit threats by evidence of the creditor's past collection practices, known to the debtor. See United States v. Marchesani, 457 F.2d 1291 (6th Cir. April 5, 1972) pointing out that evidence of extortionate means applied to others and made known to the victim may be introduced on trial.

made upon Clyde, his family and his property. They were made to effectuate their repayment of a loan which required weekly collections well after the statute was effective. We think that the evidence abundantly establishes that the June and July payments were prompted by the April and May threats and that certainly this is all the statute requires for a conspiracy violation.

That the statute embraces post-enactment actions motivated by a pre-enactment threat which remains efficacious was recently the holding of United States v. Annoreno, 460 F.2d 1303 (7th Cir. May 26, 1972), which dealt with a conspiracy to violate 18 U.S.C. § 892. The court states,

> "The relevance of the pre-May 29, 1968, transactions is readily apparent. The defendants were obviously engaged in a continuing course of conduct which began several years before the statute took effect and did not change afterward. In extending credit after the operative date of the statute, they necessarily relied upon and used the impressions created in the minds of potential borrowers by actions and utterances which occurred before the enactment of the statute. For example, borrowers who were threatened with physical violence in the event of nonpayment of loans negotiated prior to enactment were certain to understand the extortionate nature of loans procured subsequent to enactment." Id. at 1307.

The case before us is in fact stronger since the pre-enactment threats here related not to another transaction but to the very loan which extended into the post-enactment period. The latest were made only 21 days before the statute was enacted.[6]

Thus we finally arrive at the crux of the matter—was the trial judge correct in determining that there was sufficient proof beyond a reasonable doubt that there was a criminal conspiracy in violation of § 894 in effect on May 29, 1968 which continued from that date until it was frustrated by the flight of the Clydes in late July, 1968. There is no doubt in our minds that this proposition was clearly established.

The initial agreement and burgeoning partnership to extort the collection of the loan and vigorish are not left to the inferences which becloud the search in other conspiracy cases. Chief Judge Friendly in United States v. Borelli, 336 F.2d 376, 384 (2d Cir. 1964), cert. denied, 379 U.S. 960, 85 S.Ct. 647, 13 L. Ed.2d 555 (1965) commented upon the difficulty in determining what agreement can be inferred in a narcotic conspiracy case even where there is a repeated pattern of purchases. No such problem is created by the loan sharking conspiracy. Once it is established, and it is not controverted here, that a $2000 loan was made in January, 1968 with vigorish computed at $4000, with weekly installments of $150 to be made over a 40 week period to Carvelli, acting for Lauria and Smith, there is no difficulty in attributing the post-enactment payments to the initial arrangement which necessitated a continuing relationship. The subsequent collections cannot be viewed in isolation as separate or unrelated transactions. See United States v. Kissel, *supra*, 218 U.S. at 607, 31 S.Ct. 124, 54 L.Ed. 1168.[7]

6. This court was faced with an analogous situation when reviewing a conviction for a substantive violation of 18 U.S.C. § 1951 (extortion) where the only threat was made in 1952 and as to that the statute of limitations had run. Chief Judge Lumbard writing for the court stated, (United States v. Tolub, 309 F.2d 286, 289 (2d Cir. 1962)):

> "Admittedly the initial threat was made back in 1952, but the statute does not require a verbal threat. It requires only that defendant induce his victim to part with property through the use of fear . . . The jury is permitted to find such inducement by use of fear from testimony as to the state of mind of the victim." (citations omitted).

7. Appellant Lauria's contention that the post-statutory payments to defendants were not the result of the conspiracy but

The post-enactment transactions here demonstrate the continuing criminal partnership of Smith and Lauria who had designated Carvelli their collector. Eight payments of principal and vigorish were made with regularity by Mrs. Clyde at the cocktail lounge, as prearranged, from May 30 to July 17, 1968. Carvelli admitted turning over the money to either Smith or Lauria whoever appeared first at the bar. Smith complained about being shortchanged and each of the appellants separately advised Carvelli that they would have to get together to straighten the matter out. On learning that Clyde had fled, Smith lamented to Carvelli that he had been left "holding the bag." The same dirty game with the same cast and the same rules was being played after May 29th as before. The continuing use of the common collector, the sharing of the collections and the expressed desire of each conspirator to get together to straighten the matter out, can only be referable to a "continuous co-operation of the conspirators to keep it up", United States v. Kissel, supra, 218 U.S. at 607, 31 S.Ct. 124, 126, 54 L.Ed. 1168. There was "continuity of action" here sufficient to indicate that the conspiracy was continuous. Fiswick v. United States, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946). There is no suggestion of withdrawal by either, no abandonment of the venture, only the frustration caused by the flight of the Clydes.

There is no doubt but that the collections that were made in June and July were the result of fear and, in fact, terror. Mrs. Clyde was normally accompanied to the place of payment by a friend or neighbor and her fear was visible. When Carvelli was not present at the appointed time, Mrs. Clyde was forced by her husband to visit the bar the next day lest harm come to them. Their removal of children from school before the

term was ended and their own midnight flight from home all support the finding that the collections by Carvelli acting for Lauria and Smith were prompted by the continuing threat of harm made just weeks before.

 Appellant Lauria's claim that his fifth amendment rights were violated by his being subpoenaed before the grand jury when he was a prospective defendant, is without merit and was properly disposed of below.

Convictions affirmed.

---

constituted "merely the routine execution of a bilateral agreement between Carvelli and Mrs. Clyde", which antedated the statute, is not only euphemistic but un-

realistic. The third party "beneficiaries" of the bilateral contract suggested, continued to be Lauria and Smith.