**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gary BOWDACH, Defendant-Appellant.**

**No. 71-2304.**

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1974.

Rehearing Denied Oct. 21, 1974.

Daniel S. Pearson, Miami, Fla. (Court-appointed), for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., James H. Walsh, Atty., Dept. of Justice, Tampa, Fla., John J. Robinson, Atty., Dept. of Justice, Washington, D. C., Gary Betz, Asst. U. S. Atty., Dept. of Justice, Strike Force, Miami, Fla., for plaintiff-appellee.

Before TUTTLE, GEWIN and THORNBERRY, Circuit Judges.

TUTTLE, Circuit Judge:

A grand jury for the Southern District of Florida indicted Gary Bowdach, Louis Joseph ("Chick") Cicchini, Stanley ("Sonny") Brock and Gaetano Thomas ("Tom") Milici on November 19, 1970, for twenty-three violations of the Extortionate Credit Transactions Act, 18 U.S.C. § 891 et seq. Appellant Bowdach moved to dismiss the indictment on the ground that Rule 6(d) of the Federal Rules of Criminal Procedure had been violated by the presence of an unauthorized person in the Grand Jury room, and on February 23, 1971, the motion was granted. United States v. Bowdach, 324 F.Supp. 123 (S.D.Fla.). A new grand jury returned a superseding indictment, charging the same defendants with the same violations, on March 4, 1971. Bowdach was the only defendant brought to trial, and he was tried on fifteen counts. After trial by jury, he was convicted on one count of conspiracy to violate section 892 [1] (count 1) and six counts of substantive violations of sections 892 (counts 2, 12, 14 and 16) and 894 (counts 3 and 17). [2] The govern-

---

1. Section 892, 18 U.S.C. § 892, provides in full:

"§ 892. Making extortionate extensions of credit

(a) Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

(b) In any prosecution under this section, if it is shown that all of the following factors were present in connection with the extension of credit in question, there is prima facie evidence that the extension of credit was extortionate, but this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a):

(1) The repayment of the extension of credit, or the performance of any promises given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor

(A) in the jurisdiction within which the debtor, if a natural person, resided or

(B) in every jurisdiction within which the debtor, if other than a natural person, was incorporated or qualified to do business at the time the extension of credit was made.

(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial methods of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.

(3) At the time the extension of credit was made, the debtor reasonably believed that either

(A) one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or

(B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.

(4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence of any of the circumstances described in subsection (b)(1) or (b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing the understanding of the debtor and the creditor at the time the extension of credit was made, the court may in its discretion allow evidence to be introduced tending to show the reputation as to collection practices of the creditor in any community of which the debtor was a member at the time of the extension."

2. Section 894, 18 U.S.C. § 894, provides in full:

"§ 894. Collection of extensions of credit by extortionate means

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonrepayment thereof,

shall be fined not more than $10,000 or imprisoned not more than 20 years, or both.

ment dismissed seven counts against Bowdach, and the jury found him not guilty on one count. He was sentenced to concurrent terms of fifteen years imprisonment on each count. On appeal, Bowdach raised for the first time the issue of validity, under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., of procedures used to secure wiretaps used as evidence that led to his conviction. We remanded the case to the district court for an evidentiary hearing, in light of this Court's en banc decision in United States v. Robinson, etc., 472 F.2d 973 (1973), to determine whether the wiretap applications were properly authorized under 18 U.S.C. § 2516(1). *See* United States v. Bowdach, 474 F.2d 812 (5 Cir. 1973). On remand, the district court held (1) that the Attorney General had personally authorized the request for the application for the wiretap order, and (2) that the disparity between the "authorizing individual" designated in the application for the order and in the subsequent order was not fatal to the validity of the procedure. United States v. Bowdach, 366 F.Supp. 1368 (S.D.Fla.1973).

We have held this case pending decision by the United States Supreme Court in United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380, on the wiretap issue. Bowdach challenges his convictions not only on the ground that they were obtained with the fruits of invalidly approved wiretaps, but also on the grounds *inter alia* that certain provisions of the Extortionate Credit Transactions Act (the "Act") are unconstitutional and that certain evidence was inadmissible.

We affirm.

## I. FACTS

At the time of his arrest, Bowdach was employed as a used-car salesman in Miami. There is ample evidence that he frequently made extortionate cash loans on the side, many to others in the used-car business. His conviction for conspiring to violate section 892 of the Act, which prohibits making extortionate extensions of credit,[3] was based primarily on the evidence of transcribed wire-tapped conversations between him and Cicchini. His convictions on the substantive counts of violating sections 892 and 894, which prohibit collections of extensions of credit by extortionate means,[4] were based on the testimony of several debtors—principally Joseph S. Leal,

(b) In any prosecution under this section, for the purpose of showing an implicit threat as a means of collection, evidence may be introduced tending to show that one or more extensions of credit by the creditor were, to the knowledge of the person against whom the implicit threat was alleged to have been made, collected or attempted to be collected by extortionate means or that the nonrepayment thereof was punished by extortionate means.

(c) In any prosecution under this section, if evidence has been introduced tending to show the existence, at the time the extension of credit in question was made, of the circumstances described in section 892(b)(1) or the circumstances described in section 892(b)(2), and direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available, then for the purpose of showing that words or other means of communications, shown to have been employed as a means of collection, in fact carried an express or implicit threat, the court may in its discretion allow evi-

dence to be introduced tending to show the reputation of the defendant in any community of which the person against whom the alleged threat was made was a member at the time of the collection or attempt at collection."

3. "Extortionate extensions of credit" are defined by the Act, 18 U.S.C. § 891(6) as "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation or property of any person."

4. "Extortionate means" is defined by the Act, 18 U.S.C. § 891(7), as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation or property of any person."

Richard ("Rick") Moore, and James Bell—and of a Mrs. Margaret Stallard.

It is unnecessary to review the wiretap evidence, because appellant complains only of the procedures used to obtain it and not of its sufficiency; however, the evidence of the three debtors named above and of Mrs. Stallard requires specific attention. Count 12 of the indictment pertained to loans made to Leal; counts 2 and 3 pertained to loans made to Moore; counts 14, 16 and 17 pertained to loans made to Bell. Appellant was convicted on each of these counts. Mrs. Stallard did not borrow money from the appellant; she testified of threats made to her by the appellant in a dispute over a car sold to her by him, and of a threatening message he asked her to deliver to Bell.

Leal borrowed money twice from Cicchini, $100 in January, 1970 and $300 in March or May, 1970. The interest on each loan was "6, 7 or 8%" per week. Leal reluctantly admitted that he knew at the time of the first loan that if he didn't repay it, he would "get a broken leg or something." He said he knew at the time the second loan was made that Cicchini had a reputation for violence concerning the lending of money. Leal was instructed twice by Cicchini to make his payments to the appellant, and Leal paid off the final installments of principle and interest on each loan to the appellant.

Moore borrowed a total of $300 to $350 from the appellant in two transactions early in 1970. Interest was $14 per week for one year on the $200 transaction. Moore said that at the time of the loans he knew the appellant had a reputation for violence in his collection practices.

Bell took out two loans from the appellant, for $200 in early 1970 and for $50 a few months later. Interest was $20 per week. Bell said that he "understood" at the time of the first loan that "if I didn't pay somebody comes around and beats you up." In April, 1970, Bell left Miami while still owing the appellant $250.

Mrs. Stallard testified that she had purchased a car from the appellant for $1,005 in early 1970, paid $300 down and arranged with the appellant to make weekly payments of $15. The car did not run properly, and Mrs. Stallard returned it to the appellant but continued to make weekly payments. At one point, she threatened to go to the State Attorney over the transaction, but the appellant told her ". . . you got those two kids to think about, if you do this [complain to the State Attorney], a lot of harm can come to you and those kids." Mrs. Stallard also testified that after Bell left Miami, the appellant telephoned her and asked her to relay a message to Bell: "He [the appellant] said that he had men looking for Bell in North Carolina and that they were going to bring him back and shoot him and cut his balls off and hang them in the Dolphin's Locker [a bar where she worked]." She added that the appellant also told her that he had held a gun on Moore and cut him with a knife. Mrs. Stallard relayed the message to Bell.

## II. VALIDITY OF THE WIRETAPS

Appellant contends that the evidence obtained from wiretaps on three telephones at his place of business should have been suppressed at trial, because the procedures used in obtaining the taps did not comport with 18 U.S.C. § 2516(1),[5] which requires authorization

---

5. Section 2516, 18 U.S.C. § 2516(1), provides in pertinent part:

"§ 2516. Authorization for interception of wire or oral communications

(1) The Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an applica-

tion to a Federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation, or a Federal agency having responsibility for the

for wiretaps to be made by the "Attorney General, or any Assistant Attorney General specially designated by the Attorney General," and 18 U.S.C. § 2518(1) (a), (4)(d),[6] which requires that the individual authorizing the application and order for a wiretap must be identified to the issuing judge. When the point was raised for the first time on appeal, we remanded for evidentiary hearing to determine whether then Attorney General Mitchell had personally authorized the application or whether he had designated then Assistant Attorney General Will Wilson to undertake the discretionary act of authorization. *See* United States v. Bowdach, 474 F.2d 812, 814.

The facts developed at the hearing were almost identical in effect with those in the Supreme Court case of United States v. Chavez, *supra*. The wiretap phase of the case has therefore been decided adversely to Bowdach's contentions.

## III. USE OF REPUTATION EVIDENCE IN SECTION 892 CONVICTIONS

Appellant challenges his convictions for substantive violations of section 892 on the grounds that the admission of evidence as to his reputation for violence in credit practices was not statutorily authorized and not constitutionally permissible.

### A. *Statutory Authorization*

Appellant contends that the admission of reputation evidence was not authorized under § 892(c), because the prerequisite was not met of showing that "direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available." It is unnecessary to meet this contention, however, because the admission of such evidence was clearly authorized under § 892(b)(3)(B), which allows evidence of the debtor's reasonable belief that the "creditor had a reputation for the use of extortionate means" in his collection practices.

Although reputation evidence is allowed under both §§ 892(b)(3)(B) and 892(c), the operation of the two sections is not identical and it may be helpful at this point to note the differences. § 892(c) allows the introduction of evidence of the creditor's reputation in collection practices, provided three prerequisites are met:

1) evidence has been introduced tending to show that the loan would be legally unenforceable, and

2) that the annual rate of interest exceeded 45 per cent, and

3) "direct evidence of the actual belief of the debtor as to the creditor's collection practices is not available." Where the requirements are satisfied,

---

investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of—

\*    \*    \*    \*    \*

(f) any offense including extortionate credit transactions under sections 892, 893, 894 of this title . . ."

6. Section 2518, 18 U.S.C. § 2518, provides in pertinent part:

"§ 2518. Procedure for interception of wire or oral communications

(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the

applicant's authority to make such application. Each application shall include the following information:

\*    \*    \*    \*    \*

(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;"

\*    \*    \*    \*    \*

(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

\*    \*    \*    \*    \*

(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application \* \* \*"

reputation evidence may be introduced "for the purpose of showing the understanding of the debtor and the creditor" at the time of the loan.[7] There are no prerequisites, however, for the introduction of reputation evidence under § 892(b)(3)(B). Such evidence is merely one of four factors that must be established to make out a prima facie case of violation of the section.[8]

### B. *Constitutionality*

■ Appellant contends that the introduction of reputation evidence is so prejudicial that it deprives him of Due Process of law as guaranteed by the Fifth Amendment. It is true, of course, as a general principle that in criminal cases the prosecution may not introduce any kind of evidence in its case-in-chief of the defendant's evil character or reputation in order to establish probability of guilt. *See* Michelson v. United States, 335 U.S. 469, 475, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Railton v. United States, 127 F.2d 691, 692 (5th Cir. 1949); Hurst v. United States, 337 F.2d 678, 680 (5th Cir. 1964). The principle is not absolute, and this Court has noted exceptions. *See Hurst, supra,* at 680–681.

The use of reputation evidence under the Act is not really an exception to the general principle, however, because such evidence is used *not* to establish probability of guilt but to demonstrate the *victim's state of mind* regarding the transaction. Fear is the central element in crimes of extortion, and often the victim may reasonably be in fear without possessing knowledge of specific acts of the victimizer. This fear may extend beyond the act or transaction involved, and may even follow the victim to the witness stand, as Congress recognized when considering the Act. The legislative history of the Act shows that Congress felt it was necessary to permit the use of reputation evidence under certain circumstances, due to the reluctance of loan-sharking victims to testify;[9] otherwise, it might be virtually impossible to demonstrate the victim's state of mind toward the transaction.[10]

Following the intent of Congress, the courts have uniformly allowed the introduction of reputation evidence under the appropriate circumstances for the purpose of showing the victim's state of mind. United States v. De Lutro, 309 F.Supp. 462, 467–468 (S.D.N.Y.1970); United States v. Curcio, 310 F.Supp.

7. § 892(c) was apparently intended to cover the situation where the debtor *himself* was dead or too frightened to give *any* testimony regarding the creditor's collection practices. *See* United States v. Joines, 327 F.Supp. 253, 256 n. 5 (D.Delaware 1971). Thus § 892(c) is supplementary to § 892(b), and not merely an alternate provision for introducing reputation evidence.

8. It must be remembered, of course, that § 892(b) is not exclusive, and that it may be unnecessary to resort to either § 892(b) or (c) where direct evidence is available of a violation under § 892(a). *See* the legislative history of the Act set out at 1968 U.S.Code Cong. and Admin.News p. 2027.

9. The case before us presents a good example of the problem Congress saw. One of the debtors, Moore, was very reluctant to testify, and said on the stand that he was nervous and scared to give testimony against the appellant.

10. The legislative history and purpose of the Act is set out at 1968 U.S.Code Cong. and

Admin.News, p. 2025 et seq. The conference report noted at pp. 2026–2027:

"The major difficulty which confronts the prosecution of offenses of this type . . . is the reluctance of the victims to testify. That is, if they are in genuine fear of the consequences of nonpayment, they are apt to be equally or *even more* in fear of the consequences of testifying as a complaining witness [emphasis added].

✱ ✱ ✱ ✱ ✱

"The trial court is in the best possible position to appraise the probative value of such evidence and to weigh that against its possible prejudicial effects. The ban on reputation evidence as part of the prosecution's case in chief has never been absolute, and where, as here, *it is directly relevant to the state of mind of the parties* in entering into the transaction, there will undoubtedly arise cases where it should very properly be before the trier of facts [emphasis added]."

351, 357 (D.Conn.1970); United States v. Webb, 463 F.2d 1324, 1328 (5th Cir. 1972). Reputation evidence has also been allowed to show the victim's state of mind in prosecutions for extortion under the Hobbs Act, 18 U.S.C. § 1951. Carbo v. United States, 314 F.2d 718, 741–742 (9th Cir. 1963), cert. den. sub nom., Palermo v. United States, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498; United States v. Tropiano, 418 F.2d 1069, 1081 (2nd Cir. 1969), cert. den. sub nom., Grasso v. United States, 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530; United States v. DeMasi, 445 F.2d 251, 257 (2nd Cir. 1971), cert. den., 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164; United States v. Billingsley, 474 F.2d 63, 65–66 (6th Cir. 1973); United States v. Stubbs, 476 F.2d 626, 627–628 (6th Cir. 1973).

The courts in *De Lutro* and *Curcio* specifically addressed the question of the constitutionality of permitting reputation evidence under the Act,[11] and found it permissible.

■ We agree with the courts that have upheld the constitutionality of the Act in allowing the use of reputation evidence in the prescribed circumstances, and we are not convinced by the appellant that such evidence prejudiced his trial in violation of the Fifth Amendment. The evidence was used only to show the victim's state of mind; where such evidence is admitted for this limited purpose, the Constitution is satisfied.

## IV. ADMISSIBILITY OF MRS. STALLARD'S TESTIMONY

Appellant contends that Mrs. Stallard's testimony as to a threat made by him to her over the legal automobile sale was inadmissible, because it was not similar fact evidence, not statutorily authorized and, thus, it unfairly prejudiced him.

■■ It should be emphasized that the appellant was not charged with violating the Act with respect to Mrs. Stallard. Her testimony was admitted as "similar fact" evidence for the purpose of showing the appellant's "intent" in collection practices generally. The admission of such evidence is discretionary, and the exercise of this discretion requires "balancing of the probative value of the proffered evidence . . . against its prejudicial character." United States v. Byrd, 352 F.2d 570, 574 (2nd Cir. 1965). One factor to be weighed in this balance is the necessity for the prosecution to "sharpen" its proof of intent by showing similar acts to demonstrate that the alleged crime in question was not done innocently or by accident or by mistake. United States v. Byrd, *supra*, at 575. In the case before us, the prosecution was not faced with this necessity. Appellant's reputation for violence in collection practices had been established. Nor was Mrs. Stallard's evidence necessary to establish or to "illuminate" the relationship between the appellant and Leal, Moore or Bell. *Cf.* United States v. Nakaladski, 481 F.2d 289, 296 (5th Cir. 1973). The prejudicial effect of Mrs. Stallard's testimony is obvious, and "[w]here the prejudice is substantial and the probative value, through the nature of the evidence or the lack of any real necessity for it, is slight, its admission . . . may be held to be an abuse of discretion." United States v. Byrd, *supra*, at 575. Under this test, Mrs. Stallard's testimony as to threats connected with the sale of the car should not have been admitted.

■ Moreover, it cannot be said that Mrs. Stallard's testimony on this point was specially authorized by the Act under § 894(b), which allows evidence of other extortionate collections made by the defendant *with the victim's knowledge* to be introduced for "showing an

---

11. Both courts were examining challenges to the introduction of reputation evidence under section 894(c), but the issues are virtually the same in sections 892(b)(3)(B), (c), and 894(c).

implicit threat" to the victim. The prosecution in the case before us did not attempt to show that the threat to Mrs. Stallard was made with any victim's knowledge. Thus, the testimony was not authorized by the Act. *See* United States v. Marchesani, 457 F.2d 1291, 1296 (6th Cir. 1972).[12]

 However, our conclusion that this testimony was inadmissible does not mean, as appellant declares, that it "infected the entire proceedings and prejudiced the defendant beyond any hope of recovery." The government had proved its case completely without Mrs. Stallard's testimony on this incident. We conclude, after a thorough and independent examination of the record, that the admission of this testimony was harmless error beyond a reasonable doubt and thus that appellant's convictions must be affirmed. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); United States v. Resnick, 483 F.2d 354, 357 (5th Cir. 1973), cert. denied, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246.[13] For a case in which it was held that erroneous admission of such evidence in similar circumstances did not require reversal, *see* United States v. Kennedy, 291 F.2d 457, 459 (2d Cir. 1961).

## V. USE OF REPUTATION EVIDENCE IN SECTION 894 CONVICTIONS

 Appellant challenges his convictions for substantive violations of section 894 on the same ground that he challenges his convictions under section 892. *See* section III, *supra*. Because the issues with respect to the admissibility of reputation evidence are essentially the same here as they are under section 892, and because appellant received con-

current sentences on each count, under the "concurrent sentence doctrine" we find it unnecessary further to examine this argument. Hirabayashi v. United States, 320 U.S. 81, 105, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). *See also* Lawn v. United States, 355 U.S. 339, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Thomas v. United States, 431 F.2d 940, 941 (5th Cir. 1970); United States v. Abigando, 439 F.2d 827, 829 (5th Cir. 1971); United States v. Johnson, 496 F.2d 1131 (5th Cir. 1974).

## VI. CONCLUSION

We have examined the other contentions made by the appellant, but find them to be without merit. Accordingly, the judgment of the trial court must be affirmed.

---

12. In admitting evidence of similar extortionate acts not alleged in the indictment, the court in *Marchesani* said, ". . . it is well established that evidence of similar acts against other persons, *which were known by the victim to have occurred*, are admissible to show generation of the element of fear in

the victim [emphasis added]." 457 F.2d at 1296.

13. Mrs. Stallard's testimony as to Bowdach's ugly threat to Bell was admissible, of course, and was not even challenged on appeal.